# CASES

IN THE

# SUPREME COURT OF ILLINOIS.

## FIRST GRAND DIVISION.

### JUNE TERM, 1869.

THE PEOPLE OF THE STATE OF ILLINOIS, *ex rel.*

EZRA B. McCAGG *et al.* Commissioners of Lincoln Park,

*v.*

THE MAYOR, COMPTROLLER AND CITY CLERK

Of the City of Chicago.

| 51 | 17 |
| 133 | 460 |
| 133 | 491 |

| 51 | 17 |
| 151 | 677 |
| 155 | 450 |

| 51 | 17 |
| 178 | 383 |

| 51 | 17 |
| 73a | 128 |

| 51 | 17 |
| 187 | ³624 |

| 51 | 17 |
| 95a | ¹287 |

| 51 | 17 |
| 97a | ²590 |

| 51 | 17 |
| 106a | ² 77 |

1. MANDAMUS—*of the pleadings.* An alternative writ of mandamus stands in the place of a declaration in an ordinary action at law, and must show a case *prima facie* good, and, as in ordinary cases, a demurrer thereto brings before the court the whole merits of the case as therein presented.

2. SAME—*when it will lie.* A writ of mandamus will only be awarded in a case where the party applying for it shall show a clear right to have the thing sought by it done, and by the persons or body sought to be coerced.

2—51ST ILL.

3. MUNICIPAL CORPORATIONS—*by whom taxes may be imposed.* The act of February 8, 1869, fixing the boundaries of Lincoln Park, in the city of Chicago, and providing for its improvement, in providing means for paying for land to be taken for the park, requires the mayor, comptroller and clerk of the city, to issue bonds on the requirement of the park commissioners created by the act, and this requirement upon those city officers is absolute, not submitting the question of creating such a debt to the people of the city, or to its corporate authorities. The act confers no express power upon the park commissioners to levy and collect taxes for the payment of the bonds, but it is equivalent thereto, as resort must be had to taxation for their payment, and it seems it would be difficult to sustain that portion of the act, on the mere question of the exercise of the taxing power, the park commissioners not being a corporate authority of the city, and to no other authority than such corporate authority can the legislature delegate the power to impose corporate taxation, under sec. 5 of art. 9 of our constitution, which provides that the corporate authorities of cities, etc., may be invested with power to assess and collect taxes for corporate purposes.

4. To what extent this constitutional provision is a limitation upon the power of local taxation directly by the legislature itself, is not a question in this case, but it seems there may be cases where the legislature, without the consent of the corporate authorities, might impose taxes, local in their character, if required by the general good government of the State, because such taxes would not be merely and only for corporate purposes.

5. MUNICIPAL CORPORATIONS—*of the power of the legislature to compel them to incur debts without their consent.* While it is conceded that municipal corporations, which exist only for public purposes, are subject at all times to the control of the legislature creating them, and have, in their franchises, no vested right, and whose powers and privileges the creating power may alter, modify or abolish at pleasure, yet that power cannot be so used as to compel such a corporation to incur a debt without its consent—to issue its bonds against its will, for the erection of a public park, or for any other improvement.

6. So, under the act referred to, in relation to the establishment and maintenance of Lincoln Park, in the city of Chicago, requiring the city officers to issue the bonds of the city, on the simple requirement of the park commissioners, the court will not compel the issuing of the bonds at the instance of the park commissioners, and without the consent of the proper authorities of the city.

7. Should the common council, however, clothed as it is by the charter, with power over the subject in reference to which the bonds are to be applied, pass an ordinance directing the officers named in the act to issue them, the courts might interfere and compel them by mandamus to do the required act.

8. And again, under that clause of our constitution which prohibits the State from creating a debt exceeding fifty thousand dollars, without the consent of the people, manifested by a vote at a general election, the legislature might be regarded as prohibited from forcing one of the municipalities of the State to incur debts for the much larger amount contemplated by the act, without the consent of the people of such municipality, or of their corporate authorities.

This is an application to this court, in the name of the people, on the relation of Ezra B. McCagg and others, Commissioners of Lincoln Park, for a writ of mandamus, to compel the mayor, comptroller and city clerk of the city of Chicago, to issue and deliver to the relators, the bonds of the city, as required by the 12th section of the act of February 8, 1869. entitled " An act to fix the boundaries of Lincoln Park, and provide for its improvement."

Mr. W. C. GOUDY, for the relators.

The legislature had the power to require the mayor, comptroller and clerk, to issue the bonds upon the demand of the relators, and it was not necessary to submit the question of creating such indebtedness to the municipal corporation of Chicago, or to the common council, or to the mayor and comptroller.

1. The legislature has full power over municipal corporations; they are only agents of the legislative will, parts of the machinery by which the people or a portion are governed, within the rules and limitations of the constitution, and are without vested right. Cooley's Const. Lim. 192, 193, 231, 235 and 250; *Field* v. *People*, 2 Scam. 79; *Mason* v. *Wait*, 4 ib. 127; *People* v. *Reynolds*, 5 Gilm. 13; *Shaw* v. *Dennis*, ib. 416; *Richland Co.* v. *Lawrence Co.* 12 Ill. 1; *Springfield* v. *Power*, 25 Ill. 187; *Dennis* v. *Maynard*, 15 Ill. 477; *The People* v. *Ottawa*, 48 Ill. 233; *Thomas* v. *Leland*, 24 Wend. 67; *Town of Guilford* v. *Chenango*, 3 Kern. 143; *Kirby* v. *Shaw*, 19 Pa. St. 258; *Sharpless* v. *Mayor*, 21 Pa. St. 166; Burrough

Dunmore's Appeal, 52 Pa. 374; *State* v. *St. Louis Co. Court*, 34 Mo. 572; *Dayton* v. *New Orleans*, 12 La. An. 515; *Cheany* v. *Hooser*, 9 B. Mon. 330; *Slack* v. *Maysville & Lex. R. R.* 13 B. Mon. 26; *Nicol* v. *Mayor*, 9 Humph. 265; *Mayor* v. *State*, 15 Md. 462; *People* v. *Mahoney*, 13 Mich. 500; *Montpelier* v. *East Montpelier*, 27 Vt. 704; *Aspinwall* v. *Commissioners Daviess Co.* 22 How. 377; *People* v. *Pinckney*, 32 N. Y. 377.

2. The legislature has full control of the property and money of a municipal corporation, and may direct its use for any purpose consistent with the public interests, of which it is the judge.  Cooley's Const. Lim. 235; *Richland Co.* v. *Lawrence Co.* 12 Ill. 1; *Trustees* v. *Tatman*, 13 Ill. 30; *Greenleaf* v. *Trustees*, 22 Ill. 236; *Springfield* v. *Power*, 25 Ill. 187; *Dennis* v. *Maynard*, 15 Ill. 477; *The People* v. *Ottawa*, 48 Ill. 233; *East Hartford* v. *Hartford Bridge Co.* 10 How. 532; *Mayor* v. *State*, 15 Md. 462; *Montpelier* v. *East Montpelier*, 27 Vt. 704; *Same* v. *Same*, 29 Vt. 19; *State* v. *St. Louis*, 34 Mo. 572; *People* v. *Morris*, 13 Wend. 395; *People* v. *Batcheldor*, 22 N. Y. 128.

3.  The legislature may authorize the authorities of a municipal corporation to levy and collect taxes for corporate purposes.   State Constitution, art 9, sec. 5; *Shaw* v. *Dennis*, 5 Gilm. 416; *Cheany* v. *Hooser*, 9 B. Mon. 330.

The legislature may also authorize the levy and collection of taxes for local purposes, by others than the corporate authorities, or those denominated officers under the municipal charter.  *Dennis* v. *Maynard*, 15 Ill. 477; *People* v. *Ottawa*, 48 Ill. 233.

The legislature may create a debt or impose local taxes without the agency or consent of the corporate authorities. Cooley's Const. Lim. 231; *Dennis* v. *Maynard*, 15 Ill. 477; *People* v. *Ottawa*, 48 Ill. 233; *Kirby* v. *Shaw*, 19 Pa. St. 258; *Sharpless* v. *Mayor*, 21 Pa. 166; Burrough Dunmore's Appeal, 52 Pa. 374; *Thomas* v. *Leland*, 24 Wend. 67; *Town of Guilford* v. *Chenango*, 18 Barb. 615; *Same* v. *Same*, 3 Kern.

143 ; *People* v. *Mitchell,* 45 Barb. 208 ; *Same* v. *Same,* 35 N. Y. 551 ; *People* v. *Mahoney,* 13 Mich. 500 ; *Nicol* v. *Mayor,* 9 Humph. 266 ; *Mayor* v. *State,* 15 Md. 462.

The purchase of land for a park for a city, is a proper corporate object.   *Owners Ground* v. *Mayor,* 15 Wend. 376 ; Matter Central Park, 16 Abb. Pr. R. 56.

The 5th sec. of art. 9 of the constitution, is not a prohibition or limitation on the exercise of power by the legislature so as to prevent the imposition of taxes without the agency of the corporate authorities.   The object of this section was, perhaps, to remove any doubts as to the power of the legislature to delegate the power of taxation.   *Nicol* v. *Mayor,* 9 Humph. 266.

But the clear object was to prescribe a uniform rate of taxation within the limits of the municipal corporation, and to limit the exercise of the power to corporate purposes.   *Taylor* v. *Thompson,* 42 Ill. 12.

There is no such express prohibition or limitation, and no constructive restriction will be allowed as against the power of the legislature.   *Mayor* v. *State,* 15 Md. 462 ; *People* v. *Marshall,* 1 Gilm. 689.

The mayor, comptroller and clerk are corporate authorities.

The relators are not authorized by the act to, and do not fix the amount of the debt or tax.   The legislature have decided that the public interest required Lincoln Park to be extended to the limits fixed in the act itself, and provided means for its purchase and condemnation.   The amount of bonds, not exceeding $500,000, is to be determined and fixed by the value of the land described in the act.   The only power in the relators is to judge of the amounts required, and if an over amount is issued, they cannot be negotiated or used for any other purpose than paying for the land.

This act does not impose any tax whatever.   It authorizes the purchase or condemnation of the land, the fee to vest in the city, and the creation of a debt to pay the purchase or condemnation money.   The constitution does not, in terms or by

implication, prohibit the legislature from taking land for a public park, the expense to be paid out of the revenues of the city in the future. It does not follow that such debt is to be paid by taxation. The city owns real and personal estate of large value, which may be converted into money. The last legislature authorized, by what is known as the "lake front bill," the sale and conversion of property of the city which will immediately produce $800,000, and before this debt will mature, $10,000,000 or $12,000,000 to the city, which is to be used for public parks.

The act set out in the writ does not expressly or by implication take away from the city the power previously conferred to lay out and improve parks.

The legislature did not, in the charter, divest itself of the right to create a park.

If it did, the passage of the act recited in the writ repealed the charter provision. *Robertson v. Rockford*, 21 Ill. 458.

Mr. THOMAS HOYNE, also for the relators, in support of the proposition that the legislature had the constitutional power to require the officers of the city named in the act to issue the bonds of the city, without submitting the question to the people or to the corporate authorities of the city, cited *Nichols* v. *Mayor, etc. of Nashville*, 9 Humph. 266 ; *Bank of Rome* v. *The Village of Rome*, 18 N. Y. 39 ; *People* v. *Mitchell*, 45 Barbour, 211 ; *People* v. *Mahoney*, 13 Mich.

In answer to the objection that, by the act in question, the issue of the bonds to the park commissioners, imposed an obligation on the city against the will of the citizens and without the assent of the corporation, and that they will be compelled to discharge this debt by an ultimate exercise of the power of taxation, counsel cited Cooley on Constitutional Limitations, pp. 232–3, where the learned author says, if the cases he refers to are sound, "the limitations which rest upon the power of the legislature to compel municipal corporations to assume and discharge obligations can only

· be such as spring from the general principles governing taxation—namely, that the demand or purpose for which the tax is levied, shall be such as to constitute a proper charge or burden upon the State or portion of the State taxed to pay or accomplish it.    But, upon this question the legislature is vested with discretionary and compulsory power, and its decisions are not subject to review in the courts.    They must be final, unless in clear cases, where there being no ground to adjudge the purpose to be a proper one for taxation, the legislature may be held to have proceeded unwarrantably."

The cases cited are :    *Thomas* v. *Leland*, 24 Wend. 67 ; ·*Guilford* v. *Supervisors Chenango*, 18 Barb. 615 , same case, 13 N. Y. 143 ; *People* v. *Mitchell*, 45 Barb. 208 ; *People* v. *Power*, 25 Ill. 187 ; *People* v. *Mayor of Brooklyn*, 4 N. Y. 419 ; *Cheany* v. *Hooser*, 9 B. Mon. 330 ; Burrough Dunmore's Appeal, 52 Pa. 374 ; *Louisiana* v. *Layton*, 12 La. An. 315.

In support of the absolute power of the legislature over the whole subject of taxation, the counsel cited *Shaw* v. *Dennis*, 5 Gilm. 417 ; *City of Ottawa* v. *The People ex rel Caton*, 48 Ill. 233 ; *Town of Keithsburgh* v. *Frick*, 34 Ill. 421 ; *Robertson* v. *City of Rockford*, 21 Ill. 459 ; *Dennis* v. *Maynard*, 15 Ill. 477 ; *Kirby* v. *Shaw*, 19 Pa. St. R. 258.

Messrs. STORRS & WILSON and Mr. S. A. IRVIN, for the respondents.

After reviewing the authorities cited in behalf of the relators, counsel said, the fact that no instance can be found, where for purely local purposes the legislature has seen fit to compel local authorities to impose taxes within their limits, without their consent, is of great force in showing that, as a general principle, the power does not exist, and wherever it is exercised, as in the cases cited from 24 Wendell and 3 Kernan, the right can be supported upon some recognized power in the legislature other than that of taxation.

And denying the power of the legislature to compel municipalities to incur debts against their will, and thereby to compel a resort to taxation for the payment of such debts, counsel cited *Hampshire* v. *Franklin*, 16 Mass. 87 ; *Cheaney* v. *Hooser*, 9 B. Mon. 338 ; Cooley on Constitutional Limitations, 234–5 ; 4 N. H. 566 ; *Calder* v. *Bull*, 3 Dall. 386 ; *Wilkinson* v. *Leland*, 2 Peters, 627.

The mass of authorities seeming to establish a different doctrine than here contended for, on the question of local taxation, arose on the consideration of statutes *wholly permissive, not mandatory.* See *Prettyman* v. *Board of Sup's*, 19 Ill. 406 ; *Harrison* v. *Holland*, 3 Gratt. 247 ; *Talbot* v. *Dent*, 9 B. Mon. 530 ; 13 B. Mon. 13–26 ; *Cheaney* v. *Hooser*, 9 B. Mon. 344 ; *Daniel* v. *Mayor*, 11 Humph. 583 ; *Sharpless* v. *The Mayor, etc.* 21 Pa. St. 160–182 ; *Goddin* v. *Crum*, 8 Leigh, 155 ; *Nichol et al.* v. *Mayor of Nashville*, 9 Humph. 263.


Mr. CHIEF JUSTICE BREESE delivered the opinion of the Court :


The questions presented by this record arise on a demurrer to an alternative writ of mandamus, issued on the relation of Ezra B. McCagg, John B. Turner, Joseph Stockton, Andrew Nelson, and Jacob Rehm, styling themselves " Commissioners of Lincoln Park," in the city of Chicago, and against the mayor, comptroller and clerk of that city, requiring them to show cause why a peremptory writ should not be awarded against them, to compel them, forthwith, to execute and deliver to the relators certain bonds of the city, to which they claim to be entitled, in virtue of an act of the general assembly of this State, entitled, " An act to fix the boundaries of Lincoln Park, and provide for its improvement," approved February 8, 1869.

The act in question is set out in the writ.   It devotes certain lands within defined boundaries in the towns of North Chicago and of Lake View to the purposes of a public park, to

be known as " Lincoln Park."    All the land within the designated boundaries, belonging to the city, is appropriated without any compensation to the city, and the title to other lands for the same purpose, is permitted to be acquired by purchase or condemnation.

A board of commissioners is created, with authority to purchase any of the lands within the designated boundaries, at fair and reasonable prices, to be determined by them, and to be paid for out of bonds or money coming to their hands for the purpose of acquiring title.    Such lands to be conveyed to and vest in the city, to be used as a part of the park.    For the purpose of acquiring land by condemnation, appraisers were to be appointed by the circuit court of Cook county, on application of the board of commissioners.

It is then provided by section 12, as follows :    For the purpose of paying for the land taken for such park under the provisions of this act, the bonds of the city of Chicago, to such an amount as shall be necessary for that purpose, shall be issued by the mayor, comptroller and clerk of said city, from time to time, as the same shall be required by the board of park commissioners, for the purpose aforesaid, and shall be delivered to said board upon demand.    And said bonds shall be payable in twenty years from the date thereof, and shall bear interest at the rate of seven per cent. per annum, payable half-yearly, on the first days of January and July in each year; and the said bonds and the proceeds of the sale thereof, shall constitute the fund for paying the cost of the lands taken for the park.

By section 14, authority is given the board of commissioners to use these bonds at their par value, by paying any amount which the city shall have become liable to pay for the lands purchased or condemned, or they may sell the bonds at public or private sale, or by subscription, upon such terms as said commissioners shall determine ; and power is given to pledge the bonds for money borrowed temporarily, at a rate

of interest not exceeding ten per cent. per annum, if deemed expedient by the commissioners so to do.

Section 16 pledges the property of the city and the lands so authorized to be-taken for the park, for the payment of the principal and interest of these bonds.

Section 19 places the park under the exclusive control and management of a board of commissioners, to consist of five persons, named and styled "The Commissioners of Lincoln Park."

Section 20 appoints the relators the first board of commissioners, to hold office as such for five years, without any compensation for their services, and in case of a vacancy within the five years, the same to be filled by the remaining members of the board, and all vacancies occasioned by expirations of the terms of office, to be filled by the judge of the circuit court of Cook county.

Section 21 gives to this board the exclusive control and government of the park, with power to lay it out and regulate it, and to pass ordinances for its government; to appoint engineers, surveyors, clerks and other officers, except a police force ; to prescribe and define their duties and authority, to fix the amount of their compensation, and require bonds for the faithful performance of their duties, and generally, to possess all the power and authority by law conferred on, or possessed by, the common council of the city in respect to public squares and places in the city, and to vacate any public street or alley within the limits of the park.

By section 3 of an act amendatory of this act, approved March 30, 1869, it was provided, that the common council of the city should not issue, or cause to be issued, nor should any officer of the city execute or negotiate the bonds of the city for the use of this park, to an amount exceeding five hundred thousand dollars.

These are all the portions of the acts upon which the questions arise, and which have been so fully discussed. It may be here stated, that North Chicago, South Chicago and West

Chicago, are regularly organized townships of Cook county, and which together complete the city of Chicago. The town of Lake View is also an organized township, but forms no part of the city.

The alternative writ alleges that the relators accepted the place of commissioners, took the oath and gave the bonds as prescribed by the act; that they met and organized by the election of Ezra B. McCagg, president, and appointed Joseph Stockton secretary, and since their organization they had caused surveys to be made, and had applied for the appointment of appraisers, who were appointed by the circuit court of Cook county ; that the appraisers have qualified and entered upon the discharge of their duties, and that the relators, as such commissioners, have negotiated with some of the owners for a part of the property embraced within the limits of the park, to procure the title thereof for the city, and have, generally, undertaken to perform the duties enjoined upon them as commissioners, by the act, and have paid and become liable to pay several thousand dollars, and that the city of Chicago has, by its proper officers, the board of public works, recognized the relators as the lawful commissioners authorized to take charge of, improve, manage and control this park.

The relators further allege that they had, as commissioners, ascertained from information and from estimates made by them, as well as from negotiations to obtain the lands belonging to private persons, authorized to be taken, that it would require the issue, by the mayor, comptroller and city clerk, of bonds to the amount of five hundred thousand dollars, to be used for the purpose of paying for the land to be taken, and they determined, and now allege the fact was and is, that bonds to the amount of five hundred thousand dollars should be issued immediately for that purpose, and that they, acting as such commissioners, by and through their president, E. B. McCagg, did, on the 14th of May, 1869, apply in writing to those officials at their respective offices, to issue such bonds, which they refused, in writing, to do. And the relators allege,

by reason of such refusal they are prevented from acquiring for the city of Chicago, for the purpose of a public park, any of the lands belonging to private persons or corporations, and from enlarging and improving the park, as contemplated by the act, and aver they have no adequate remedy except by mandamus.

The alternative writ stands in the place of a declaration in an ordinary action at law, and must show a case *prima facie* good, and, as in ordinary cases, the demurrer brings before the court the whole merits of the controversy. The writ is only to be awarded in a case where the party applying for it shall show a clear right to have the thing sought by it done, and by the persons or body sought to be coerced. *The People, etc.* v. *Hatch,* 33 Ill. 9.

The important question presented by the demurrer, arises upon the twelfth section of the act.

The relators insist that it is within the constitutional competency of the general assembly, to require the issue of these bonds in the manner indicated in the act, upon the demand of the relators, and that it was not necessary to submit the question of creating such indebtedness, to the municipal corporation of Chicago, or to the common council, or to the mayor and comptroller, and is the necessary result of the possession by the legislature of plenary power over municipal corporations, so full and so absolute as to obliterate them altogether, should the public exigencies so demand.

The demurrants contend, that the requirement of the twelfth section, compelling them to issue the bonds of the city to pay for the land to be taken for Lincoln Park, and to provide for its improvement, is nothing more or less than the imposition of a tax upon all the taxable property within the limits of the city, which the legislature, of itself, without the agency or consent of the city of Chicago, as a municipal corporation, has no constitutional power to impose. It is contended, it is in direct violation of sec. 5 of art. 9 of the constitution of the State, which provides that the corporate authorities of counties,

townships, school districts, cities, towns and villages, may be invested with power to assess and collect taxes for corporate purposes; such taxes to be uniform in respect to persons and property within the jurisdiction of the body imposing the same.

It is argued by the demurrants, that by force of this provision, none but the corporate authorities of a city can be invested with the power of assessing and collecting taxes—that municipal taxes can only be assessed and collected for corporate purposes, and they must be uniform with respect to the persons and property within the municipal jurisdiction.

It is also claimed that the corporate authorities of a city are the legislative department of a city government, which department, by the charter of the city of Chicago, is composed of the mayor and two aldermen for each ward, elected by the voters of the several wards, and the argument is, that by this department alone can a tax be imposed for a corporate purpose.

It is further contended, that this section of art. 9, is an absolute limitation upon the exercise of the taxing power by the legislature—that it so limits the general powers of that body in relation to municipal taxation, that all the legislature can do is to vest the power in the corporate authorities, to be exercised or not, as those authorities may deem expedient.

We have read with great care the able arguments presented by counsel on both sides, and have examined the cases to which they refer as sustaining their propositions. We have not been furnished with the constitutional provisions of the several States before whose courts these determinations cited have been made, nor do we know wherein they resemble those of this State, or differ from them. Some of the cases cited deny to the legislature the possession of the power to compel, against the will of a municipal corporation, its citizens to incur pecuniary obligations to be discharged by taxation, while other cases seem to hold that such corporations are so completely under legislative control, that the legislature may

compel them to do, whatever it may permit them to do, having the general benefit in view.

We do not consider that it is necessary we should attempt to settle these conflicting opinions, as this case does not seem to require it. We are inclined to think, as a mere question of an exercise of the taxing power, it would be very difficult to sustain this law under sec. 5 of art. 9 of the constitution.

In *Harward* v. *The St. Clair & Monroe Levee & Drainage Company*, a case submitted at the last January term, but in which no opinion had been agreed upon when this case was argued, we held this section was to be construed as a limitation upon the power of the legislature to delegate the right of corporate or local taxation to any other than the corporate or local authorities, and that by the phrase, "corporate authorities," must be understood those municipal officers who are either directly elected by the people to be taxed, or appointed in some mode to which they have given their assent. To what extent it is to be construed as a limitation upon the power of local taxation directly by the legislature itself, it was not necessary in that case, nor is it in this, to decide. However strong the argument in favor of so construing it, there nevertheless may be cases where the legislature, without the consent of the corporate authorities, might impose taxes, local in their character, if required by the general good government of the State, because such taxes would not be merely and only for corporate purposes, as if one of the cities of the State should be insurgent, requiring the interposition of the military power, it will not be denied the State, on quelling the insurrection, could impose taxes upon the city to defray the expense of a resort to military power. So, if the police department of a city should fail to furnish reasonable security to life and property, the State, undoubtedly, might provide such force, and assess the city for the expense; but the tax authorized by the act in question is for a purpose purely local and corporate, having no other element about it, and the commissioners appointed by it are, in no sense, corporate authorities of the city of Chicago.

They are a mere agency to accomplish the purpose specified in the act, and made to supersede the regularly constituted authorities of the city, to whom by the charter of the city, had been committed the establishment, control and government of the parks of the city.

Not being a corporate authority of the city of Chicago, it cannot be said they are the authority contemplated by the fifth section of article nine of the constitution, in whom the legislature may vest the power of assessing and collecting taxes for corporate purposes. Although no express power is conferred, by this act, upon these commissioners to assess and collect taxes, yet, its equivalent—or what is worse and more oppressive—a power has been conferred upon them to impose a burden upon a small locality, and without its consent, of half a million of dollars, to remove which, resort must be had to taxation, to continue for a series of years.

The relators have cited numerous cases as authority in support of the point they make, but they have failed to find a case wherein it has been held that the legislature can compel a city, against its will, to incur a debt by the issue of its bonds for a local improvement. While it is conceded that municipal corporations, which exist only for public purposes, are subject at all times to the control of the legislature creating them, and have, in their franchises, no vested right, and whose powers and privileges the creating power may alter, modify or abolish at pleasure, as they are but parts of the machinery employed to carry on the affairs of the State, over which, and their rights and effects, the State may exercise a general superintendence and control, (*Richland County* v. *Lawrence County*, 12 Ill. 8; *Trustees of Schools* v. *Tatman*, 13 ib. 30,) we are not of opinion that power, such as it is, can be so used as to compel any one of our many cities, to issue its bonds against its will, to erect a park or for any other improvement—to force it to create a debt of millions—in effect, to compel every property owner in the city to give his bond to pay a debt thus forced upon the city. It will hardly be contended, that the legislature can

compel a holder of property in Chicago to execute his individual bond as security for the payment of a debt so ordered to be contracted. A city is made up of individuals owning the property within its limits, the lots and blocks which compose it, and the structures which adorn them. What would be the universal judgment, should the legislature, *sua sponte,* project magnificent and costly structures within one of our cities— triumphal arches, splendid columns, and perpetual fountains, and require, in the act creating them, that every owner of property within the city limits should give his individual obligation for his proportion of the cost, and impose such costs as a lien upon his property forever? What would be the public judgment of such an act, and wherein would it differ from the act under consideration?

Although, by section 16, the lands to be taken for this park, and the property owned by the city of Chicago, as a corporation, are primarily pledged for the payment of the bonds demanded, and the interest upon them, ultimately, if the bonds are negotiated, both principal and interest must be paid by the people out of their individual property, should the primary fund be insufficient. This is apparent from this fifth section, which declares that "the general assembly *shall* require that all the property within the limits of municipal corporations, belonging to individuals, *shall* be taxed for the payment of debts contracted under authority of law." These bonds are a debt—it is a debt created under the authority of law, and is an enduring lien upon the property of every individual owner. The debt being created by authority of law, the legislature is compelled to require that individual property shall be taxed to pay it. They have no discretion upon the subject. Here, then, is a case where taxes may be assessed, not by any corporate authority of the city, but by commissioners to whom is entrusted the erection, establishment and control of this park, and this, without the consent of the property owners.

We do not think it is within the constitutional competency of the legislature to delegate this power to these commissioners.

If the principle be admitted, that the legislature can, uninvited, of their mere will, impose such a burden as this upon the city of Chicago, then one much heavier and more onerous can be imposed,—in short, no limit can be assigned to legislative power in this regard. If this power is possessed, then it must be conceded that the property of every citizen within it, is held at the will and pleasure of the legislature. Can it be, that the general assembly of the State, just and honest as its members may be, is the depositary of the rights of property of the citizen? Would there be any sufficient security for property, if such a power was conceded? No well regulated mind can entertain the idea, that it is within the constitutional competency of the legislature to subject the earnings of any portion of our people to the hazards of such legislation.

We fail to perceive any real difference, in principle, in forcing this burden upon the city, and imposing a like burden, by the direct action of the legislature upon individual property owners within it, for in both cases, the debt, at maturity, must be paid by such holders, while the accruing interest is a constant drain upon their resources.

No case, amid the multitude which have been cited by the relators, goes to the extent of this, and with our understanding of the constitution, no warrant is found there for such legislation. Rather than attempt to compel submission to such a law, surely, the alternative should be presented to the city to be deprived of its corporate franchises, for cases, if such legislation is sanctioned, may arise where a city would prefer such deprivation in preference to incurring a debt which might prove greatly detrimental to their prosperity or wholly ruinous.

The respondents are officers of the city, elected by the people of the several wards. They represent the people—they are their lawfully constituted agents, and have refused to issue the bonds demanded. The question is merely local, and no rights that we can discover having been acquired under the law, a proper case for our interference has not been made out.

3—51ST ILL.

If, however, the common council, clothed, as it is by the char-
ter, with power over this whole subject of parks, and with
power to direct the issue of bonds, shall pass an ordinance
directing the mayor, comptroller and city clerk to issue these
bonds, and they should refuse, we might interfere and compel
them by mandamus to do the required act, but we cannot on
this record, with the views we entertain and have expressed.

There is another view we have taken of this case, to which
we will now advert, and which seems to us to settle the ques-
tion made beyond all controversy.

By sec. 37 of art. 3 of our constitution, the State is prohibi-
ted from creating a debt exceeding fifty thousand dollars,
without the consent of the people, manifested by a vote at a
general election, and the law authorizing its creation is required
to be published at least three months before the vote is taken,
and provision is required to be made at the same time for the
payment of the interest annually as it may accrue, by a tax to
be levied for the purpose, or from other sources of revenue,
which law providing for levying such tax, is also to be sub-
mitted to the people with the law providing for contracting
the debt.

So sensibly impressed were the framers of our constitution,
of the liability of legislative bodies to incur debts, some-
times for objects not entirely praiseworthy or useful, and the
hazards, losses and disturbances to which they lead, that they
interposed the power of the people at the very threshold, to
prevent this danger—to tie up the hands of the legislature on
this subject—to divest it of a power which dear bought
experience had satisfied the people should not be left unre-
strained.

The burden imposed by this law, upon a fractional part of
this great State, is ten-fold heavier than the legislature can
impose upon the people of the whole State, without their pre-
vious consent manifested by a vote at a general election. In
view of this wise and salutary provision of the constitution,
can it be seriously contended, that the legislature can exercise

the assumed power to force one and all of the municipalities of this State, to incur debts amounting to millions of dollars, by one dash of the legislative pen, for corporate purposes, when to meet the most urgent demands of the public, and provide for the general welfare, they cannot create a debt against the State exceeding the sum of fifty thousand dollars? The proposition is so inconsistent with the spirit and plain intention of this provision that it can receive no favor in this court.

How can we hold, in view of the protection this clause was designed to give the people of the whole State, that the people of a particular municipality can be subjected to a corporate debt, without the consent either of the people to be taxed or of their corporate authorities?

The protection of the whole implies, necessarily, the protection of all its organized parts, and the whole cannot be secure while all or any of its parts are exposed to danger.   What is the real value of this provision of the constitution, if the legislature, inhibited from incurring a debt beyond fifty thousand dollars on behalf of the State, may force a debt ten-fold or one hundred-fold greater, for there is no limit to the power, upon all the cities of the State?   We can perceive none.   Where these municipalities become so indebted by compulsion of the legislature, the whole State, in its real and substantive, if not in its corporate body, will, in truth and in fact, be the debtor, for the same power of coercion can be applied to counties and towns, and as the State is made up of cities, counties and towns, the whole State may thus become involved.   This provision, then, would be no restriction upon the power to create a debt beyond a certain amount, and would fail of its purpose of protecting the State and its citizens from oppressive burdens.   Those citizens who are to be affected by the debt, should certainly have some voice in its creation, on the same principle that the people of the whole State are to express their consent by a vote, to the creation of a debt affecting them and their material interests.

We do not, of course, intend to be understood by this reasoning, as asserting that the legislature cannot authorize the proper corporate authorities of a municipality to issue its bonds for corporate purposes for more than fifty thousand dollars, even without a vote of the people. What we do say is, that an attempt by the legislature to compel a municipality to do this without either a popular vote or the assent of its duly elected corporate authorities, is not in harmony with the spirit of this provision of the constitution.

This power over municipalities is not to be found in the power conceded to the legislature to alter, modify or abolish their charters. It has no abiding place in the constitution, and we are constrained to say, the legislature in imposing this burden upon the city of Chicago, assumed a power which the constitution of the State, in its spirit and true meaning, inhibited them from exercising.

We have been referred to the case of *The City of Ottawa,* v. *The People, ex rel. Caton,* 48 Ill. 233, as conclusive in favor of the relators. We do not so understand it. In that case, the question of the constitutionality of the act of the legislature requiring the levy and collection of a tax for the construction of the bridges within the corporate limits of the city of Ottawa, was not argued, and was not really presented by the record. The tax had been levied and collected and disbursed in building the bridges, without objection. The act authorizing their construction, provided, that when finished they should be under the control of the city authorities for the use of the public. They were pivot bridges, and when completed, the city refused to take charge of them, or to incur the expense of making them available to the public. A mandamus was allowed to compel them to perform the duty enjoined upon them by the act.

Had the tax-payers resisted the levy and collection of the tax, on the ground that neither the people of the city, nor the corporate authorities, had assented to its imposition, some analogy might have existed. That case only holds that the

city should perform a duty imposed upon it by the act autho-
rizing the construction of the bridges.

Disposing of the main question renders it unnecessary to
discuss the question—are these commissioners officers?

On the whole case, it seems to us one where the city should
be permitted to submit to a deprivation of its corporate fran-
chises, instead of being placed under a mandamus by the
courts.  This alternative, as we have before said, ought in
justice be allowed it.  If this act of the legislature is sanc-
tioned, the same power can be applied to all our counties,
cities, and incorporated towns, and the very consequences pro-
duced, which it was the object of sec. 37 of art. 3 of the
constitution to prevent.

We do not think a case for the interference of this court is
presented by the alternative writ, and the demurrer thereto
must be allowed and the peremptory mandamus refused.

*Mandamus refused.*