[No. 266. Decided July 17, 1891.]

A. J. BAKER, FRED E. SANDER AND JAS. A.·MOORE V.
THE CITY OF SEATTLE, HARRY WHITE, *as Mayor of
said City,* H. W. MILLER, *as Clerk of said City,* C.
W. FERRIS, *as Comptroller of said City,* AND N. W.
HARRIS & CO.

MUNICIPAL CORPORATIONS—ISSUANCE OF BONDS—INDEBTEDNESS
—ASSENT BY VOTE—CONSTITUTIONAL LAW—CONSTRUCTION OF
STATUTES—ELECTIONS.

Where street improvement warrants, under powers conferred by
a city charter, are payable from funds derived by creating local
assessment districts within which a special levy could be laid upon
the property to pay for the entire expense of street improvements,

and the agreement with the contractors for work upon such improvements was that they should be paid "out of a special fund," the indebtedness created is not within the meaning of the constitutional limitation on municipal debt.

Where, under a charter power to widen streets and to condemn such real estate as may be necessary therefor, a city has taken possession of condemned lands, without collecting benefits assessed therefor, or making payment of damages awarded thereon, the neglect of the city does not make such condemnation awards a part of the general municipal indebtedness.

The act of February 26, 1890 (Laws 1889-90, p. 225), empowering cities and towns organized prior to the adoption of the state constitution to extend their credit and fund their indebtedness, and validating certain indebtedness already created, is not unconstitutional by reason of embracing more than one subject.

The application of the act of February 26, 1890, to cities and towns existing at the time of the adoption of the constitution is not in violation of article 11, ? 10 of that instrument, requiring the incorporation, organization and classification of cities in proportion to population, as at the same session of the legislature in compliance with this requirement, the same authority was conferred upon municipal corporations to be thereafter organized; and the legislation of the session on this subject, though not all contained in one act, was uniform and universal in its operation.

Section 5 of the act of February 26, 1890, validating the existing indebtedness of any city or town, contracted for strictly municipal purposes, where the same exceeds the amount authorized by the charter of such city or town, and providing further that if the excess reach beyond one and one-half per cent. of the taxable property, three-fifths of the voters of the town must assent thereto, is not a void exercise of legislative power, as it falls within the principle that where a municipal corporation has done an act beyond its statutory powers, but within the powers which it was competent for the legislature to have conferred upon it, the act may be validated by a curative statute.

The act of March 7, 1891, providing for an election for the validation of warrants issued in excess of the one and one-half per cent. limit by any city or town having a corporate existence in the state is not unconstitutional on the ground of special legislation, but is a curative act, applicable only to what had been done before the date of its passage.

As the language of the constitutional provision permitting cities to incur an indebtedness up to five per cent. of their taxable property, when authorized by the legislature, is not certain to the

effect that the legislature must provide that the three-fifths vote of the citizens therefor shall be an antecedent one, the act of March 7, 1891, authorizing elections to ratify existing municipal indebtedness in excess of the one and one-half per cent. limit, is not unconstitutional.

An election to ratify municipal indebtedness in excess of the one and one-half per cent. limit, and an election to authorize the issuance of bonds to fund the debt thus ratified, together with other debt, under separate ordinances providing for the submission of both propositions to vote on the same day, can lawfully be held at the same time and places, and but one notice of election embracing the two ordinances is required.

The city of Seattle having contracted for a sale of its bonds at an agreed price in advance of the authorization of their issue by popular vote, and of the validation of the indebtedness to be funded by the bonds, it was proper, under the charter of said city, to submit the proposition of sale to vote at such election.

A proposition to issue $460,000 worth of bonds, or such lesser sum as may be sufficient, is not objectionable on the ground of indefiniteness, when the only authority to be given the city officers is to issue bonds to an amount sufficient to take up $370,979.44 worth of warrants with legal interest thereon.

It is not necessary that the proposed bonds be of the kind prescribed by the act of March 26, 1890 (Laws 1889-90, p. 520), as the provisions of that act apply specially to bonds issued to raise money for water, sewer or light plants.

*Appeal from Superior Court, King County.*

The facts are fully stated in the opinion.

*A. Battle,* for appellant.

*Orange Jacobs,* and *Burke, Shepard & Woods,* for appellees.

The opinion of the court was delivered by

STILES, J.—On the 1st day of June, 1891, an election was held in the city of Seattle, under the act of March 7, 1891, p. 267, entitled "An act to enable cities and towns to validate certain warrants and other obligations and evidences of indebtedness on the part of such cities and towns, issued by the corporate authorities thereof in excess of their legal

authority, and declaring an emergency to exist." The propositions submitted at that election were to validate indebtedness as follows: Class 1 — Warrants drawn payable out of the road fund of said city, and dated and issued on sundry days between September 21, 1889, and November 17, 1889, both inclusive, numbered from 3629 to 4029 of the year 1889, both inclusive, the face amounts whereof aggregate the sum of $33,279.92. Class 2 — Warrants drawn payable out of the road fund of said city, and dated and issued on sundry days between November 18, 1889, and February 25, 1890, both inclusive, numbered from 4030 to 4380 of the year 1889, and from 1 to 620 of the year 1890, both inclusive, the face amounts whereof aggregate the sum of $91,567.73. Class 3 — Warrants drawn payable out of the road fund of said city, and dated and issued on sundry days between February 26, 1890, and August 2, 1890, both inclusive, numbered from 621 to 2786 of the year 1890, both inclusive, and the face amounts whereof aggregate the sum of $188,350.20. Class 4 — Warrants drawn payable out of the fire fund of the said city, and dated and issued on sundry days between May 3, 1890, and August 16, 1890, both inclusive, numbered from 331 to 598, both inclusive, the face amounts whereof aggregate the sum of $57,781.59. The vote in favor of the validation was very largely in excess of the three-fifths majority required by the act, and the indebtedness covered by it stands validated unless there are constitutional reasons against it.

At the same election there was also submitted the proposition to fund this indebtedness when validated, by the issuance of bonds in pursuance of the act of March 7, 1891, p. 269, entitled "An act authorizing cities and towns to submit to the voters therein propositions to fund indebtedness of such cities and towns by the issuing of bonds therefor, at the same election at which the previous attempted incurring of such indebtedness, or any part thereof, may

be ratified." This latter proposition was also carried by an equally large vote, and the city of Seattle is preparing to issue bonds; and to prevent their issue appellants brought their action to restrain the municipal authorities from proceeding therein. Paragraph 11 of their complaint states the principal grounds of their objection to the bonds, which are as follows:

"(1) That at the date of issue of all the warrants proposed to be validated, from warrant No. 4251, in class 2, dated December 7, 1889, for the sum of $32.87, and payable out of the road fund of said city, its absolute indebtedness, excluding these warrants, was $160,169, which was one per cent. of the taxable property of said city, according to the last previous assessment thereof, August 30, 1889, the assessment having been $16,016,900. (2) That at the date of issue of all the warrants proposed to be validated, from warrant No. 1395 in class 3, dated May 3, 1890, for the sum of $36.81, payable out of the road fund of said city, its absolute indebtedness, excluding these warrants, was $240,253.50, which was one and one-half per cent. of the taxable property of said city according to the said assessment. (3) That there were outstanding, and not included in the above mentioned $240,253.50, of absolute indebtedness, or in any of the warrants claimed to have been validated, on the 5th day of May, 1890, certain 'street improvement warrants' issued under and by virtue of § 8, ch. 3 of the charter of the city of Seattle, granted by the territorial legislature February 4, 1886, amounting in all to $303,817, and which should be considered as part of the general indebtedness of said city. (4) That prior to May 5, 1890, the city of Seattle had, by virtue of the power conferred upon it by § 5 of chapter 2 of its said charter of 1886, condemned and taken certain lands in said city to widen and extend Front, Second, Commercial, South Second and South Third streets, and to establish a certain public square at the northwest corner of Front street and Yesler avenue; that, in the course of such condemnation and taking, awards of damages had been allowed against it in the total sum of $247,000, which sum should be considered as a part of the general indebtedness

of said city; for the reason that the said city has taken possession of said lands, but has paid no part of the said awards, and has collected less than one per cent. of the same from the property assessed to pay therefor. (5) That at the dates of the issuance of all the warrants in classes 3 and 4, issued after May 5, 1890 — that is to say, beginning with warrant No. 333, for the sum of $450, payable out of the fire fund of said city, and including said warrant, and all warrants dated and issued subsequently thereto, and included in classes 3 and 4 — the absolute indebtedness of said city, if said street improvement warrants and said condemnation awards were a part thereof, exceeded five per cent. of the taxable property of said city, as appeared by the assessment of August 30, 1889, to wit, $827,833. (6) That there has been no vote of said city to authorize its indebtedness to be increased beyond one and one-half per cent., other than the vote of June 1, 1891."

The answer of the city admitted the facts stated in the complaint to be true, but alleged affirmatively :

"(1) That by § 5 of the act of February 26, 1890 (Acts 1890, p. 225), all of the indebtedness of the city of Seattle in excess of one per cent. of the assessment of 1889, and not in excess of one and one-half per cent. thereof, was validated and made legal indebtedness thereof. (2) That on February 26, 1890, the absolute indebtedness of the city of Seattle, including the indebtedness thus legalized, did not reach the limit of one and one-half per cent., nor was that limit reached until April 29, 1890, and after the issuance of warrant No. 1394, on the road fund, for the sum of $1,575, included in class 3. (3) That by the terms of the said street improvement warrants, and under the law governing their issuance, they were not primarily a general liability of the city of Seattle, but were chargeable to and payable out of particular funds, to be derived from local assessments. (4) That the said condemnation awards were likewise not a primary or general liability of the city, but were chargeable and payable out of local assessments only."

The plaintiff interposed a general demurrer to the answer, upon the argument of which the court sustained it as a demurrer to the complaint, and dismissed the action.

Before proceeding to pass upon the other features of this case we will speak of the two classes of alleged indebtedness which would absorb a very large portion of the city's debt creating power if they were to be counted as a part of its constitutional liabilities, viz., the street improvement warrants and the condemnation awards.

*First:* Under the charter of 1886 the city of Seattle had the power to make street improvements either with funds drawn directly from the treasury or by creating local assessment districts upon the property, within which a special levy could be laid to pay for the entire expense. These warrants were the result of proceedings of the latter class. They show upon their face that they are payable out of the "street improvement funds, under ordinance No. —." The agreements with the contractors for the work were to the effect that they should be paid "out of a special fund." It is fair to presume that the special funds have been provided by the city in all these cases, and that in due course the money will be realized to pay off the warrants. What might be the liability of the city in case it should fail, neglect or refuse to collect special taxes in such cases, is not for us to say here. It suffices that there is no present liability on the part of the city to pay out of its treasury.

In *Argenti v. San Francisco,* 16 Cal. 256, there was no restriction upon the use of the funds derived from special assessments. It went into the treasury, and its identity was lost; besides which the contract sued upon was general in its terms, obligating the city to pay. The case turned upon a question of agency. In *Atchison v. Byrnes,* 22 Kan. 65, the city failed to make a sufficient assessment, and refused to issue the bonds contracted for. In *Craycraft v. Selvage,* 10 Bush, 696, the city was held liable only for that portion of the contract which fronted land not subject to assessment. As to other frontage the contractor was relegated to the land. In *French v. Burling-*

*ton,* 42 Iowa, 614, there was no intimation that the decision was placed upon any ground other than that the proposed improvement would, under the charter, have to be paid for in part out of the city treasury, the law providing for only a partial assessment upon abutting property. These cases were relied upon by the appellant, but none of them appear to sustain the argument. On the other hand, *Hitchcock v. Galveston,* 96 U. S. 341, seems to uphold the position of the respondent; and the case of *Quill v. City of Indianapolis,* 124 Ind. 292 (23 N. E. Rep. 788), clearly does so, if we are correct in our view of what the position of the city of Seattle is in reference to these warrants, viz., that whatever liability it is under is not present or absolute, but future and contingent only.

*Second:* Under its charter of 1886 the city of Seattle had the power to widen streets and to condemn such real estate as might be necessary therefor. This power was given upon the theory that it would be exercised for the special benefit of particular localities, and would be paid for by the property benefited. As required in § 101, the assessment of benefits was a part of the proceedings for condemnation, as necessary as any other part. It is shown by the record here that there was such an assessment in each case of condemnation, but that less than one per cent. of the amount assessed has been paid. With this failure to collect we have nothing to do. If the city has taken possession of the condemned lands, it is for the unpaid owners thereof to pursue such plain remedies as the law provides them. We are of the opinion that the neglect of the city does not place their claims in the category of the city's general indebtedness. The orderly progress of the business would have required that they be paid before they surrendered possession; but, if they waived their right to prepayment their resort should none the less be to the source provided by law for their re-imbursement. The

duty laid upon the city was not the payment of the awards, but the levy and collection of assessments; and until it has been fully moved to the performance of that duty and failed therein, there is no liability to pay attaching to it. *McCullough v. Mayor, etc., of Brooklyn,* 23 Wend. 458; *Sage v. Brooklyn,* 89 N. Y. 189. We therefore conclude that the street improvement warrants and the condemnation awards are not a part of the indebtedness of the city of Seattle, to be considered in this case, and this, as we understand the pleadings, relieves the case of any question arising from the claim that the city's debt June 1, 1891, exceeded five per cent. of the assessment rolls of 1889 or 1890.

The act of February 1, 1888 (page 74), permitted cities to incur indebtedness without a popular vote up to one per cent. of its taxable property. Therefore, under her assessment for 1889 of $16,016,900, the city of Seattle could lawfully owe $160,169, and no more, until the act of February 26, 1890, extended the limit to one and one-half per cent., viz., $240,253.50. But, before going further, we will revert to the indebtedness sought to be validated at the election of June 1. It does not clearly appear by the ordinances that any part of the sums covered by classes 1, 2, 3 and 4 was within the one per cent. limit, and therefore valid without a vote, but the complaint does show clearly that all of class 1, and up to and including warrant No. 4250 of class 2, were warrants within the one per cent. limit, and therefore there was no necessity for any vote to render them valid indebtedness; or, in other words, warrant No. 4251, in class 2, was the first warrant which made the city debt more than $160,169, which was then the lawful limit. That warrant was issued and dated December 7, 1889. Whatever warrants were issued, then, from No. 4251, December 7, 1889, to February 26, 1890, were void, and expressed no liability of the city.

And here are presented three material questions: (1) Was the act of February 26, 1890 (Laws 1889–90, p. 225), a void act by reason of its having embraced more than one subject? (2) Was it void because it applied only to cities or towns having a corporate existence at the time·of the adoption of the constitution? (3) Was the first clause of § 5 void because it imposed an involuntary debt upon the cities and towns to which it applied?

*First:* We hold that the act really embraced but one subject, viz., placing cities and towns upon the level of the constitution, as regarded their power to incur indebtedness. Merely incidental to this primary object was the declaration of what should be considered indebtedness within the meaning of the act, and the method of providing for its payment.

*Second:* The application of the act to cities and towns existing at the adoption of the constitution was not in violation of that instrument. True, § 10 of article 11 required the incorporation, organization and classification of cities in proportion to population; but at the same session of the legislature, by various acts, this requirement was complied with, and the same authority was conferred upon such municipal corporations as should be thereafter organized. At the date of this act it must be remembered there were no incorporated cities or towns in the state except such as had been created by special laws or charters, and there had been no law under which one could be created since the adoption of the constitution. The legislation of the session, therefore, taken *in pari materia*, was uniform and universal in its operation. That it was not all contained in one act, is not a sufficient ground for now making it wholly one-sided and unfair, which would be the result of striking out this act.

*Third:* The first clause of § 5 provides "that any indebtedness now owing by any such city or town, contracted

strictly for municipal purposes, whether the same exceeds the amount which such city or town was authorized to contract under its charter or not, is hereby validated and declared to be a binding obligation upon such city or town when the only ground of the invalidity of such indebtedness is that it exceeds the amount authorized by the charter of such city or town;" and a further clause provided that there must be a popular vote if the excess reached be beyond one and one-half per cent. Applied to Seattle, which on February 26 had warrants outstanding from No. 4251 upward, but not beyond one and one-half per cent., the effect of this section was to make all these otherwise invalid warrants as good as those within the limit of one per cent. Was the attempt to do this a void exercise of legislative power? Section 9 of article 7 of the constitution provides:

"For all corporate purposes, all municipal corporations may be vested with authority to assess and collect taxes."

And § 12 of article 11 is as follows:

"The legislature shall have no power to impose taxes upon counties, cities, towns or other municipal corporations, or upon the inhabitants or property thereof, for county, city, town, or other municipal purposes, but may, by general laws, vest in the corporate authorities thereof the power to assess and collect taxes for such purposes."

The constitution of the State of Illinois in 1848 contained the clause above quoted from article 7, *in hæc verba*, and in that state there are many well considered cases which hold that it is incompetent for the legislature to directly lay any burden of taxation for municipal purposes upon the cities of that state. See *People v. Mayor, etc.*, 51 Ill. 17. In other states not having such a constitutional provision the power of the legislature over municipal corporations has, in some cases, been held to be well nigh omnipotent, as in *Sage v. Brooklyn, supra.* We find no

case, however, in which such a constitutional expression occurs as is contained in our article 11, above quoted, and, whatever may be thought elsewhere of the Illinois decisions above quoted, they would seem to be cogent authority here. But this is not a case of original compulsion of the city of Seattle. Its municipal authorities, in the strait of an overwhelming public calamity, to rebuild and protect the city, overstepped the line of legalized indebtedness, and for the strictest municipal purposes issued the warrants from December 7, 1889, to February 26, 1890. Value in goods and labor was fully paid for these warrants, and the holders of them have at all times had the strongest moral claim for their liquidation. At all times from December 7, 1889, until the passage of this act, the constitutional limit, without a popular vote, was one and one-half per cent., the necessarily tardy action of the legislature alone delaying its extension of the power. Indeed, under the act of 1888 it is altogether likely that a majority vote of the people of the city could have authorized the issuance of every one of the excess warrants. We are therefore constrained to view this case as one within the principle long sustained by the courts, that where a municipal corporation has done an act beyond its statutory powers, but within the powers which it was competent for the legislature to have conferred upon it, the act may be validated by a curative statute. Dill. Mun. Corp. (4th ed.), §§ 79, 544, and cases cited. We have carefully examined the Illinois cases cited, viz., *Marshall v. Silliman*, 61 Ill. 226, and the series of cases following it in that state; but, especially in view of the grudging approval of them by the supreme court of the United States in *Township of Elmwood v. Marcy*, 92 U. S. 289, we do not think they should be authority here. They were railroad aid cases, in which there were numerous flagrant irregularities, and the purpose was in no case municipal. But, while curative acts

of the legislature of Illinois were set aside by the supreme
court of that state, and the rule was upheld by the supreme
court of the United States because of its long prevalence
there, and in accordance with the decision of the highest
court of the state from which the case came, the federal
court has generally held the other way, and sustained like
curative legislation. See cases cited in Dillon, and *New
Orleans v. Clark*, 95 U. S. 644.

From February 26, 1890, there was a short period when,
according to the pleadings, the indebtedness of the city of
Seattle did not exceed the one and one-half per cent. limit.
The warrants covering this period, although they needed
no validation, were also included in the classes submitted
for validation at the election of June 1st. Then, however,
there followed a class of warrants the last of which, payable
out of the road fund, was issued August 2, 1890, and the
last of which, payable out of the fire fund, was issued
August 16, 1890, all of which it is agreed were in excess
of the one and one-half per cent. limit, and were without
any legal authority until March 7, 1891, when the act
of that date, providing for an election for the validation
of such warrants was passed with an emergency clause.
Strictly, the act had no application to any of the warrants
included in the propositions to validate, excepting those
here spoken of, although some doubt as to the construction
of the former acts may have justified the submission of all
to the test of a vote. The criticism made to the act of
February 26, 1890, that it was not general, but applied
only to cities and towns "now having a corporate exist-
ence in this state," is renewed to this act; but there is no
propriety in the objection. It is a curative act, and only
applies to what had been done before the date of its pas-
sage. If, instead of the objectionable words, the act had
read, "any city or town," the effect would have been just
the same.

Far more important is the next objection, that, constitutionally, no municipal corporation can create or in any manner validate a debt in excess of the one and one-half per cent. limit, without a vote previously had to authorize it. In treating the other branches of this case we had to examine—(1) the city's inherent powers, which do not include the creation of any indebtedness; (2) the power of the legislature to compel the assumption of obligations; and now we have to do with the legislature's powers to authorize indebtedness. But for the restriction of the constitution, the legislature could compel the state's municipalities to assume the most onerous burdens or give up their corporate existence. The idea of home rule, however, is strongly pre-eminent in our constitution, and we have seen that, while cities may not become indebted in any sum, for any purpose, beyond their current revenues, without the consent of the legislature, on the other hand the legislature has no power to force upon them any undertaking which will involve the expenditure of money without the consent of the municipal authorities or the people. The legislature has seen fit, however, to commit to the city government the authority to create debts for municipal purposes up to the constitutional limit of one and one-half per cent., at their own discretion.

Section 2 of the act of February 26, 1890, and the other acts of that session, then went further, and permitted a further indebtedness up to the five per cent. limit, whenever three-fifths of the voters therein assent thereto. This we conceive to mean that, before any such additional debt shall be lawfully created, an election shall have been had, and the authority voted. But here the vital question appears whether the legislature is bound by the terms of the constitution, so that it can, under no circumstances, permit the vote of assent to be taken after the benefit for which the debt is sought to be undertaken has been re-

ceived. The state, by its constitution, consented that there be a debt of five per cent., the legislature assenting thereto. The language of the constitution is not certain to the effect that the legislature must provide for an antecedent vote. Construction alone can make the language certain. That construction is, under all rules, to be in favor of the freedom of the legislature; the constitution being an instrument containing restrictions upon the legislative power, which would otherwise be universal and unlimited. The legislature has by the act of March 7, 1891, placed its construction upon the constitutional provision; and, unless it has done violence to the necessary construction of the provision, its construction is entitled to stand. What are the facts? The legislature had full power to consent to the authorization of indebtedness beyond one and one-half per cent. It and the people alone are concerned, and they have agreed that up to the date of the act of March 7 the vote might follow the act of the municipal authorities in accepting service and goods for the use of the city, and that, having been so accepted, they may be paid for. It is not the best policy for a city to pursue. Its obligations beyond the one and one-half per cent. are void. The legislature might refuse to exercise its authority, and the people might decline to give their votes of assent. But, having done so, we believe it would be overstepping the bounds of judicial necessity were we to hold their acts to be void and unconstitutional. Circumstances have little weight with judicial decisions, but we cannot fail to remember that our constitution was framed while the smoke of overwhelming and unprecedented calamity yet hovered over some of our most thrifty and promising communities; that the very provisions we are discussing, which make large allowances for municipal indebtedness, were framed with a view to their habilitation and further preservation; and that the legislation which followed was cast in the same mold,.

through a universal desire that in no portion of her commonwealth should the public credit of the state be tarnished or depreciated. The vote by which the validation in this case was accomplished was not merely three-fifths to two-fifths, but more than ten to one, showing an almost unanimous desire of the people of Seattle to assume and pay their excess liabilities. It would border upon tyranny were the rest of the state to stand in the way of so patriotic a sentiment. We do not find any impediment in the constitution, and therefore the act of March 7 is conclusive.

There were some minor objections to the issuance of the bonds in question which we shall now notice. The city council passed ordinance No. 1706, calling the election on June 1st, on the question of the validation of the excess indebtedness; and it also passed ordinance No. 1707, calling an election upon the same day, under the act of March 7, 1891, p. 269, to determine whether bonds should issue covering the indebtedness sought to be ratified, and other existing indebtedness of the city embraced in the four classes of warrants hereinbefore mentioned. The additional points raised mainly relate to the ordinance No. 1707, and will be treated *seriatim*.

*First:* There was but one notice of election embracing the two ordinances. Under the statute but one election was provided for, although there were to be separate votes on the separate propositions. We hold that but one notice was required or proper.

*Second:* Before the election was ordered, the city authorities entered into a contract with N. W. Harris & Co., of Chicago, Ill., the substance of which was that the election should be called, and that whatever of the warrants in the said four classes should be valid warrants on the 1st day of July, 1891, should be funded by the issuance of city bonds, which should be sold to Harris & Co., they agreeing to take them upon terms specified. The question

whether this contract should be carried out was also submitted to vote at the election under ordinance No. 1707. The act of February 26, 1890, simply provided in general terms for the issuance of bonds to fund indebtedness, leaving the details of issue entirely to the municipal authorities. In *Yesler v. Seattle,* 1 Wash. 308 (25 Pac. Rep. 1014), we held, in relation to a similar matter, that it was not proper for the city council to submit these details to the popular vote; and under the act of February 26, 1890, it would seem that it is not necessary that the question of funding ever be submitted. But the act of March 7, 1891, p. 269, seems to imply that in the cases covered by it the question of funding should be submitted, though the details of the funding are here omitted also. Recurring, however, to the act of March 24, 1890, p. 215, which confers the powers of cities of the first class, we find in the fourth subdivision this authority:

"*Fourth:* To borrow money for corporate purposes on the credit of the corporation, and to issue negotiable bonds therefor on such conditions and in such manner as shall be prescribed in its charter."

The charter of October 1, 1890, of the city of Seattle, in the fifth subdivision of § 22, art. 4, empowers the city council to borrow money for corporate purposes on the credit of the city, and to authorize the issue of negotiable bonds therefor in accordance with the charter and the constitution and laws of the state. This, under the law, would leave the matter of issuing bonds to the wisdom of the council, both as to the propriety of the issue and the details. But by § 30, art. 4, there is this further provision:

"When loans shall be created exceeding one and a half per centum of the taxable property in the city, and bonds therefor issued by the city under this charter, the city council, in authorizing and providing for the same, shall direct the times and manner of payment and rates of interest; but no such bonds shall be issued except as pro-

vided by law, nor unless the proposition for creating such indebtedness shall have been previously submitted to the electors of the city at a regular general or special election, of which thirty days' notice shall have been published in the city official newspapers, and such proposition shall have then received the assent of three-fifths of the voters voting at such election. The mode and manner of submitting such proposition to the voters shall be prescribed by ordinance. And, in case such three-fifths of the voters are in favor of such loan, the city council may, after such election, by ordinance confirm the loan; but no bonds shall be issued therefor until after such confirmation, nor until the city council shall have made specific provision for payment annually of interest on such bonds, and for a fund to pay the interest on such bonds, and a sinking fund to be raised by annual tax at least five years before the bonds are due, sufficient to pay and discharge such bonds at maturity; and the faith and property of the city shall be and is hereby pledged for the final payment of any and all such loans."

Inasmuch as a part of the bonds proposed in this instance were to fund indebtedness in excess of one and one-half per cent., § 30 made it necessary to submit the entire proposition in substantially the form in which it was submitted, and there was no error.

*Third:* The amount of bonds proposed to be issued and voted was $460,000. The face of the warrants to be funded is $370,979.44, and the interest accrued thereon was estimated in ordinance 1707 to be $48.200.56, making a total of $419,180. Objection is made that the proposition to fund was indefinite as to amount, and for that reason cannot stand. There is no perceptible reason why the sum needed could not have been reached without leaving so wide a margin as the difference between $460,000 and $419.180. But the only authority given the city officers is to issue bonds to an amount sufficient to take up the warrants, the face value of which is $370,979.44, and the legal interest thereon; and until it shall appear that they are about to exceed that authority there would be no

just cause of complaint. It is presumed that all officers concerned in the issuance of these bonds will strictly follow their authority in the premises, as any departure therefrom would subject them and their bondsmen to personal liability.

*Fourth:* Some question was made as to whether the ordinance should not have provided for bonds of the kind prescribed by the act of March 26, 1890, p. 520, but we do not consider any of the provisions of that act as applying to any bonds other than those specially provided for therein, viz., for those issued to raise money for water, sewer, or light plants. The judgment of the court below is therefore affirmed.

ANDERS, C. J., and HOYT, SCOTT, and DUNBAR, JJ., concur.