### Ex Parte J. M. Anderson.

No. 2718. Decided June 15, 1904.

**1.—City Charter and Ordinances—Constitutional Law.**

Where the Constitution speaks, it expresses the will of the people; that all power is in the people; that the Legislature, courts and executive and all the machinery put into operation by virtue of the Constitution are but the creatures of that instrument, or the people speaking through the same.

**2.—Same—Intent of the People Paramount.**

The purpose and intent of the people in ordaining the Constitution must be the purpose to be carried out by all the agencies created under it and clothed with power, authority or direction in executing any of its commands or behests.

**3.—Same—Legislative Omnipotence.**

The rule of legislative omnipotence applies only to administrative power, to the end that the Legislature may carry out the mandate of the Constitution to prescribe reasonable regulations for and put into operation the subordinate divisions and subdivisions of the State.

**4.—Same—Local Self-Government Supreme.**

The Legislature can not take constitutionally from the people the power of control over their local affairs and centralize that power in a general government, or some central authority created by the Legislature.

**6.—Election of City Officers Common System.**

The system of electing the mayor, aldermen and other city officers was common at the time of the adoption of the present Constitution, and was the established plan of municipal government, and it could not have been the purpose of the framers of that instrument to destroy a system of municipal government so well established in this State.

**7.—Constitution Recognizes Elective Officers.**

The Constitution of 1876 expressly recognizes mayors, aldermen and others as elective officers of city governments and confers many powers upon towns and cities which the legislative will can not change.

**8.—Intention of Framers of Constitution to Preserve Landmarks of Local Government.**

It was the purpose of the framers of the present Constitution to preserve the old landmarks of local self-government and representative democracy, by making the officers of cities elective, and thus erect a barrier against centralization in the State government.

**9.—Government of Checks and Balances.**

The State government, like the National government, is one of checks and balances, and no co-ordinate branch can constitutionally encroach upon another, and where the appointive system is applied in municipal government that power has been vested in the city council who are elected by the people.

**10.—Frame Work of Local Self-Government.**

The right of local self-government is as much a part of the frame work, machinery, theory, reason and spirit of our government, as is the government itself as framed by the Constitution.

**11.—History of Elective System.**

The history of municipal government in Texas shows that it is based on the elective system of its officers.

**12.—Habeas Corpus—Illegal Arrest—Discharge of Relator.**

The Legislature was without constitutional power to authorize, by special charter, the Governor to appoint a board of commissioners for the City of Corsicana, and the appointment of the chief of police by such commission was equally void, and he was without legal authority to arrest and hold relator for a violation of a State law and the latter under a writ of habeas corpus will be discharged from custody. Brooks. J., dissenting.

**13.—City Courts—Jurisdiction.**

A city court has no authority to try violations of the State penal statutes.

From Navarro County.

Original application for habeas corpus, for release from arrest by chief of police of city of Corsicana, appointed by a commission appointed by the Governor under special charter; the arrest being for violation of State Sunday law.

The opinion states the case.

*Ballew & Wheeler,* for relator.—Respondent, John Stewart, is not a sheriff, constable, lawful marshall, nor a peace officer of the State, and has no right to restrain applicant, or hold him by virtue of any writ,

although the same may have been issued by legal authority, by a legal court; because the said John Stewart has not been elected city marshal by a vote of the people of Corsicana, but was appointed city marshal by the board of commissioners for Corsicana, who were appointed by the Governor of Texas, as provided for in section 271 of the special act of the Legislature, known as special charter for Corsicana. This act is unconstitutional.

Said act of the Legislature is unconstitutional, because it attempts to abolish and destroy the existence of the local body politic, or municipal government of the city of Corsicana, which was instituted by the people of Corsicana for their benefit, and pursuit of happiness, and to protect their life, liberty and property, and to promote their general welfare; and said act of the Legislature seeks to impose upon the people of said locality a municipal government without the consent of said people. The Legislature can neither destroy an existing municipal government, nor force the people residing therein to alter, amend, or abolish the same, nor compel them to accept another and different government. The attempt to dissolve the old incorporation of Corsicana by said special act of the Legislature, and put the so-called special charter into immediate effect, without the consent of the people, at the instance of less than a dozen of the inhabitants of said city, is an unconstitutional invasion of the right of local self-government, and is contrary to the common and civil law. Secs. 1, 2, 3, 10, and 19, of art. 1; art. 2; sec. 12 and 26, art. 4; sec. 3, art. 6; secs. 56 and 57, of art. 3; 14th amendment Const. U. S., sec. 1; People v. Chicago, 51 Ill., 17; State v. Moores, 41 L. R. A., 624; City of Lexington v. Thompson, 68 S. W. Rep., 477; Railway Co. v. Clinton Co. Com., 1 Ohio St., 77; Hamilton v. St. Louis Co. Ct., 15 Mo., 5; Mt. Hope Cem. v. Boston, 158 Mass., 509; 35 A. S. R., 515; Rathbone v. Wirth, 34 L. R. A., 408; Holt v. Denny, 4 L. R. A., 65; Evansville v. Indiana, 4 L. R. A., 93; People v. Hurlburt, 9 Am. Rep., 103; People v. Detroit, 15 Am. Rep., 202; State v. Fox, 56 L. R. A., 893; Kennedy v. Brunst, 26 Wis., 412; 7 Am. Rep., 84; People v. Lynch, 21 Am. Rep., 677; Townsend v. Porter, 90 N. Y., 63; Bolton v. Albertson, 55 N. Y., 50; Wood v. Draper, 15 New York, 532; Newport v. Horton, 50 L. R. A., 330; O'Conner v. Fond Du Lac, 53 L. R. A., 831; Mechem on Public Officers, 123; Dillon Mun. Corp., 58; State v. Barker, 93 Am. St. Rep., 222; sec. 4, p. 397 et seq.; sec. 5, p. 416 et seq.; sec. 8, p. 543 et seq.; Cooley Const. Law, 5 ed., 49, 208; Ex parte Lewis, 73 S. W. Rep., 811, 45 Texas Crim. Rep., 1; N. O. M. & C. Ry. Co. v. New Orleans, 25 La. Ann., 481.

*Howard Martin,* Assistant Attorney-General, for the State. *John R. Mays,* City Attorney of Corsicana, also for the State.—The sections of the special charter of Corsicana relating to the corporation court are a literal copy of the act of the Twenty-sixth Legislature creating a corporation court for each city and town in Texas. Acts of 26th Leg., p. 40; Special Act 28th Leg., p. ——; Corsicana Charter, sec. 49 et seq. This

in law was merely a re-enactment for the purpose of establishing the court in Corsicana. Ex parte Wilbarger, 41 Texas Crim. Rep., 514; Ex parte Hart, 41 Texas Crim. Rep., 581; Rev. Stats., art. 3255; Whisenhunt v. State, 18 Texas Crim. App., 491; Allrecht v. State, 8 Texas Crim. App., 313; Chapman v. State, 16 Texas Crim. App., 76; Ex parte Creel, 29 Texas Crim. App., 439.

The corporation court act of the Twenty-sixth Legislature created the corporation court and provided that the same should be effective in cities and towns when organized by such cities and towns. The act of the Twenty-eighth Legislature provided that Corsicana should have the benefit of said court by literally readopting the act.

The charter of Corsicana provided for the appointment of three commissioners by the Governor, and these commissioners are empowered to appoint the city marshal and policemen of Corsicana. Stewart, who arrested relator, was the city marshal of Corsicana appointed by the commission. The city council fixes the salary of the marshal and policemen and appropriates funds for the payment thereof. Ex parte Lewis, 7 Texas Ct. Rep., 974, 45 Texas Crim. Rep., 1; Ex parte Levine, rendered at this term; State ex rel. Wood v. Draper, 15 N. Y., 532; Rathbone v. Wirth, 150 N. Y., 459; Board of Health v. Hesiter, 37 N. Y., 661; Davouck v. Moore (Mich.), 28 L. R. A., 783; Code Crim. Proc., art. 43; Rev. Stats., art. 363; Newburn v. Durham, 31 S. W. Rep., 195; Givens v. City of Paris, 24 S. W. Rep., 974; Sarah Whitfield v. City of Paris, 84 Texas, 431.

DAVIDSON, PRESIDING JUDGE.—Applicant was convicted in the city court of the city of Corsicana for violating the State statute prohibiting sales on Sunday. Refusing to pay his fine he was arrested by the chief of police and resorted to the writ of habeas corpus to secure his discharge, assigning therefor various reasons.

He urges want of jurisdiction in the city court to try him, as was done, for alleged violation of a State law. This contention is well taken. Sibley's case, 65 S. W. Rep., 372, is exactly in point. See also Holmes v. State, 44 Texas, 631; Ex parte Coombs, 38 Texas Crim. Rep., 648; Ex parte Knox, 39 S. W. Rep., 670; Leach v. State, 36 Texas Crim. Rep., 248; Ex parte Fagg, 38 Texas Crim. Rep., 573; Ex parte Wickson, 47 S. W. Rep., 693; Ballard v. State, 44 S. W. Rep., 864; Holland v. State, 39 S. W. Rep., 675; Bigby v. Tyler, 44 Texas, 351; Ex parte Towles, 48 Texas, 413; Williamson v. Lane, 52 Texas, 335; Ex parte Whitlow, 59 Texas, 273; Gibson v. Templeton, 62 Texas, 555; State v. De Gress, 72 Texas, 242; Crowley v. Dallas, 44 S. W. Rep., 865; Titus v. Latimer, 5 Texas, 433. This case does not come within the rule laid down in Ex parte Wilbarger, 41 Texas Crim. Rep., 514, and Ex parte Hart, 41 Texas Crim. Rep., 581.

It is further contended that he can not be held under such judgment because it is void, the city court having no authority to render the judgment. This position is also well taken. The city court has no

authority to try violations of the State penal statutes. Authorities supra.

It is also urged that Stewart, acting as chief of police, is not an officer of said city, because appointed by Pace, one of the commissioners appointed by the executive, under the terms of the special charter granted the city of Corsicana by the recent Legislature. The appointment of Stewart is alleged to be void because the Legislature has no authority to empower the Governor to appoint the commissioners who appointed him (Stewart) chief of police.

By the terms of this charter, the Governor is authorized to appoint three citizens of not less than five years residence in that city, to constitute a "board of commissioners." In pursuance to this authority the executive appointed S. A. Pace, C. H. Allyn and J. H. Woods to constitute said "board of commissioners." Pace appointed Stewart chief of police. The charter is too voluminous to be set out in this opinion, but a brief summary of it discloses that these commissioners have sole control and exclusive supervision of the fire department, police department, sanitary and street department, and the management and supervision of all public improvements ordered by the council. And they are clothed with power, and it is further made their duty to make all rules, regulations and requirements deemed proper to govern the organization, management and operation and control of fire, police, sanitary and street departments. They have exclusive power also to appoint and discharge all officers and employes in each and all of these departments and to fill all vacancies in said departments. They are also constituted the board of equalization. They are required to designate one of its members "police commissioner;" another "fire commissioner;" and another "sanitary and street commissioner;" and still another "commissioner of public improvements." The mayor shall always be designated the "commissioner of public improvements." They have as a board supervision and control over the passage of all ordinances of the city council; regulating the fees and rates of persons, firms and corporations enjoying any public franchise on account of service to be furnished the public by such persons, firms or corporations; and the forfeiture, for any cause, of all such franchises. They have complete authority over public improvements in excess of $250 ordered by the city council or board of school trustees, as well as over grants or privileges to use the streets or exercise other public privileges made by the city council. They have the same power to punish for contempt as does the county court. And all authority conferred by the charter upon this board shall be held to control the powers and duties to be exercised by the city council and board of trustees. In other words, the charter entirely subordinates the city council in these respects to this "board of commissioners," and all rules and regulations in regard to the police, fire, sanitary and street department made by said board are provided by the charter to be superior to the ordinances of the city council. Before the city council or board of school trustees shall under-

take any public improvement in excess of $250, or grant any franchise or privilege to use the street, or to exercise any public privileges or advantages in said city, or to "issue bonds for any purpose whatever," or to submit to the qualified voters a proposition to issue bonds, or before the city council shall have power to pass ordinances regulating the fares, etc., or charges in regard to franchises, or services to be rendered the public, etc., or forfeiting such franchises, or before passing ordinances or resolutions concerning any or all of these matters, these shall first have been approved by the board of cimmissioners; and only upon the report of said board of commissioners authorizing and recommending the passage thereof, shall the city council or board of school trustees have power to act in reference thereto. These matters referred to are found in sections 26, 124, 135, 172 and from 271 to 293 inclusive of the city charter.

It will be seen by the terms of the sections of the charter above referred to that the "board of commissioners" dominate and have sole control over the city council in regard to the police department, fire department and the sanitary and street department; and over all franchises and privileges to use the streets of the city for any purpose, or otherwise to exercise any public privilege or advantage in said city, and to prevent the issuance of any bonds by said city for any purpose whatever. They have the power also to prevent the submission to the qualified voters a proposition to issue any such bonds, as well as inhibit the passage of ordinances regulating the fees, charges and rates of any person, firm or corporation enjoying a public franchise, or kind of service to be furnished the public by any such person, firm or corporation; or forfeiting or declaring forfeited for any cause the franchise of any such person, firm or corporation. And by section 284, even after the board of commissioners have suggested ordinances along the line indicated for the action of the city council, said city council is prohibited from amending these matters suggested by the board of commissioners without their consent, unless by a two-thirds vote of said city council.

It also clothes this board of commissioners with power to change or repeal all existing rules and regulations concerning the police department, fire department and the sanitary and street department. Sections 276, 124 and 135 of the charter. It has further power to appoint street overseers, city physicians, etc., scavengers, etc., and inspectors. It has control over all gangs or squads or employes used or to be used in the street and alley cleaning, grading and repairing, including those who work the street by reason of failing to pay street taxes. Section 277. It is apparent from this statement that the city council is practically emasculated of power, and this "board of commissioners" is the dominating power and authority in the city of Corsicana, and without whose consent the city council seem to be practically helpless in matters of municipal legislation in respects mentioned.

It is contended by applicant that his case is brought within the rule

of Ex parte Lewis, 7 Texas Ct. Rep., 974, 45 Texas Crim.
Rep., 1. There is no question, if the decision of this court
in Ex parte Lewis, supra, is correct, and we think it is, this
charter is void as to said commissioners, and all acts by them
are void. In Brown v. Galveston, 75 S. W. Rep., 488, our Su-
preme Court took a different view. It is said in that opinion that "In
our own State the doctrine is well settled that a municipal corporation
can exist only by and through an act of the Legislature of the State,
and that it has no power not granted by the charter, and can have no
officer not provided for by law." Authorities are cited in support of
this proposition. It is also said that the Legislature has omnipotent
power with reference to legislation when not expressly or by necessary
implication inhibited by the Constitution. It is further asserted, "The
Legislature of Texas may exercise any power that could be exercised
by a constitutional convention, except wherein the Constitution con-
tains a prohibition, express or implied." It is practically asserted that
the history or existing conditions of our government can not be looked
to in construing the Constitution with reference to this question of
the right of local self-government; and it is further stated, "There were
no such municipalities within the territory constituting this State; and
we have no such traditions or history connected with the municipal
corporations to influence the court in determining the meaning of any
provision of the Constitution upon that subject." This language, taken
with the sentence immediately preceding it, holds that there were no
municipal governments in Texas prior to the State government or the
government of the Republic.

Without going into an extended discussion of the question looking
beyond the Constitution to the journals of the constitutional conven-
tion, or existing conditions of our form of government at the time of
the ordination of the last Constitution, we may concede that where
the language of the Constitution is express, commanding or prohibiting
anything, such express language would settle the question; there would
be no room for construction. But in Brown v. Galveston it is asserted,
that if there is any inhibitive power in the Constitution against omnipo-
tence in the Legislature with reference to the formation, creation or
control of municipal corporations, it is only one of implication; that
there are no express provisions inhibitive of the power of the Legisla-
ture in this respect. To this we can not agree.

With reference to the construction of constitutions, we have always
been taught that the words of that instrument are mandatory. State
v. Connor, 86 Texas, 133; Higgins v. Bordages, 88 Texas, 458; Chas
v. Swayne, 88 Texas, 218; Willis v. Owen, 43 Texas, 41; Storrie v.
Cortez, 90 Texas, 283; Storrie v. Hutcheson, 92 Texas, 685; Cannon v.
Hemphill, 7 Texas, 184; 47 Texas, 548; Hunt v. State, 7 Texas Crim.
App., 212; Cox. 1. State, 8 Texas Crim. App., 254; Holly v. State,
14 Texas Crim. App., 505; Hunt v. State, 22 Texas Crim. App., 396; 190
U. S., 787; 23 Sup. Ct. Rep., 859; Powell v. State, 17 Texas Crim. App.,

345; Cline v. State, 36 Texas Crim. Rep., 320; Hatch v. State, 10 Texas Crim. App., 515; Ex parte Ginnochio, 30 Texas Crim. App., 584; Rainey v. State, 19 Texas Crim. App., 479; Whitener v. Belknap, 89 Texas, 273; Lynn v. State, 33 Texas Crim. Rep., 153; Titus v. Latimer, 5 Texas, 433; 88 Texas, 197; Stockton v. Montgomery, Dallam, 480; Albertson v. People, 55 N. Y., 50; Rathbone v. Wirth, 34 L. R. A., 408; Van Horn v. Dorrence, 1 L. Ed. U. S. Rep., 391; Calder v. Bull, 1 L. Ed. U. S., 648; Cooley Const. Lim., 5, 57, 182, 184, 400; Sturges v. Crowninshield, 4 Wheat., 202; Newell v. People, 7 N. Y., 9, 97; People v. Purdy, 2 Hill, 31; 3 N. Y., 547; 3 Am. and Eng. Enc. of Law, 379.

Where that instrument speaks it expresses the will of the people, that all power is in the people; that the Legislature, courts and executive and all the machinery put into operation by virtue of the Constitution are but the creatures of that instrument, or the people speaking through that instrument, and these must be obedient to its commands. It is a cardinal rule in the interpretation of constitutions that words are presumed to have been employed in their natural and ordinary meaning; that the instrument must be construed as a whole, and that whatever the purpose and intention of the framers of the Constitution is as found in its language, its purport or tenor, that intent and purpose must be followed. In other words, whatever was the purpose and intent of the people in ordaining the Constituion must be the purpose and intent to be carried out by all the agencies created under it and clothed with power, authority or direction in executing any of its commands or behests.

"The Constitution of a State is adopted by the people of the State as the fundamental law of the State. This fundamental law was designed by the people adopting it to be restrictive upon the powers of the several branches of government created by it. It was intended by the people that all departments of the State government should shape their conduct by this fundamental law. Its every section was inserted for a purpose and regarded by the people adopting it as of vital importance and worthy to become a part and parcel of the constitutional form of government by which officers as well as the people were to be governed. Its every mandate was intended to be paramount authority to every person holding official trust in whatever department of government and to the sovereign people themselves. No mere unessential matters were intended to be engrafted in it, but each section and each article were solemnly weighed and considered and found to be essential to the form of constitutional government adopted. Wherever the language used is prohibitory it was intended to be a positive and unequivocal negation. Wherever the language gives a direction to the manner of exercising a power, it was intended that the power should be exercised in the manner directed, and in no other manner. It is an instrument of words, granting powers, restraining powers and reserving rights. These words are fundamental words, meaning the language itself: they breathe no spirit except the spirit to be found in them. To say that

these words are directory merely is to bring about a violation of the instrument every day and every hour. To preserve the instrument inviolate we must regard its words, except where expressly permissive, as mandatory, as pervading the spirit of command." Varoney v. Justice, 6 S. W. Rep., 459; People v. Lawrence, 36 Barb., 177; Albertson's case, 55 N. Y., 50; Rathbone v. Wirth, 34 L. R. A., 408; Williamson v. McKinney, 52 N. Y., 374; Townsend v. Porter, 90 N. Y., 68; Calder v. Bull, 1 L. Ed. U. S., 648; Scott v. Howard, 393; Ex parte Yarbrough, 110 U. S., 651; Van Horn v. Dorrence, 1 L. Ed. U. S., 391; McCullough v. Maryland, 4 Wheat., 316; Rhode Island v. Mass., 12 Pet., 657; 14 Texas Crim. App., 516; 30 Texas Crim. App., 584; 3 Texas Crim. App., 296; 7 Texas Crim. App., 212; 17 Texas Crim. App., 345; 22 Texas Crim. App., 396; 36 Texas Crim. Rep., 320; 48 Texas, 414; 89 Texas, 273; 86 Texas, 133; 36 S. W. Rep., 471; 39 S. W. Rep., 670; 44 S. W. Rep., 294; 44 S. W. Rep., 855; 44 Texas, 641.

It has been a fundamental proposition at all times, that a written constitution will be construed according to its purpose and intent, and this to be found in the language employed. Dallam, 475; 9 Wheaton, 1; 5 Cond. Rep., 562; Cline's case, 36 Texas Crim. Rep., 320; 7 N. Y., 97; 9 Colo., 80; 72 Cal., 465; 5 Nev., 399; 16 Pet. (U. S.), 612; 103 U. S., 585; 12 Wall., 531; 60 Ill., 86; 76 Ill., 34, 40; 24 Ill., 626; Black Con. Law, 68. We have always understood it to be fundamental that interpretation and construction do not precede a constitution, but must apply to and follow it. In other words, that constitutions are not made to conform to ready coined rules of interpretation and construction, but rules of construction and interpretation are made to conform to and construe constitutions.

The rule of omnipotence, announced in Brown v. Galveston, is too broadly stated, and under no circumstances has it application to the form and frame work of government and the manner of its creation; nor can it have any applicability to or authorize the changing of the form of government or subordinating the departments of government to the legislative or executive will. 6 Am. and Eng. Enc. of Law, 921, and authorities cited; 7 Ind., 44; 34 Ind., 185. This rule of omnipotence, if it be conceded to be not too strongly stated by the Supreme Court, would *only* apply where the Legislature is clothed with administrative power, to the end it may prescribe reasonable regulations for carrying out the mandate of the Constitution and putting into operation the subordinate divisions and subdivisions of the State. This rule was never intended, nor could it be true, if intended, to authorize the Legislature to destroy the right of local self-government, or the idea of a republican form of government; nor can it take from the people the power of control over their local affairs and centralize that power in the general government, or some central authority created by the Legislature. The application of the rule in Brown v. Galveston, supra, carried to its legitimate effect, would absolutely centralize the authority at Austin over all municipal and subordinate divisions of the State, and destroy

the idea of decentralization and representative democracy, which per-
meates the entire fabric of American constitutional law, and erect
instead a highly centralized government. 4 L. R. A., 98; Pom. Const.
Lim., 9 ed., sec. 151 et seq.; 1 Dillon Mun. Corp., 3 ed., sec. 9; Cooley
Const. Lim., 5 ed., 225; 24 Mich., 44; People v. Detroit, 28 Mich.,
228; People v. Chicago, 51 Ill., 17; People v. Lynch, 51 Cal., 15;
People v. Albertson, 55 N. Y., 55; People v. Porter, 90 N. Y., 68;
Evansville v. State (Ind.), 4 L. R. A., 93.

Viewed from the standpoint of the Constitution, we find that all
political power is inherent in the people. Art. 1, sec. 2, Constitution.
No citizen of this State shall be deprived of life, liberty, etc. Art. 1,
sec. 19. The right of local self-government is guaranteed to the people
of this State. Art. 1, sec. 1. The powers of the government are divided
into three co-ordinate branches, and each is expressly prohibited from
transgressing the powers of the other. The power of each branch is
necessarily delegated power, and the Constitution itself so declares.
Art 1, sec. 29. All laws and parts of laws contrary to the high powers
"herein delegated" are by article 1, section 29 of the Constitution de-
clared to be "null and void." And bearing upon this, directly and
pertinently, article 3, section 42, which pertains to the legislative branch,
expressly requires, "The Legislature shall pass such laws as may be
necessary to carry into effect the provisions of this Constitution." It
is obvious this last quotation requires—commands—the Legislature, as
a department of the government, to pass necessary laws to carry into
effect the provisions of the Constitution, and this command is to be
obeyed. No option in the matter is left, and no discretion confided.
Hipp v. Bissell, 3 Texas, 18. That powers of legislation are delegated
in one sense of the term can not be questioned. If power is inherent
in the people, and they have framed the Constitution, that Constitution
is the expression of their will, purpose and intent. Without the pro-
visions of the Constitution the Legislature does not exist. We believe
it is a fundamental proposition that the creature is not equal to the
creator, but must be subordinate to the law of that creator.

Now, the Constitution has ordained the legislative department, the
judicial department, the executive department, and has clothed each
department with certain power and commanded them to discharge the
duties devolving upon each. The Legislature is not self-existing and
would have no existence without the Constitution; and therefore it
must act from delegated authority. The same Constitution which created
the Legislature ordered and commanded that Legislature to create
municipal corporations, and hedged that body and these municipal cor-
porations around with restrictions in regard to the power and duties
that are as binding upon the Legislature as upon the municipal corpora-
tions. The same authority, the Constitution, divides the State into
districts—congressional, judicial and senatorial. It commands the Leg-
islature to create certain districts in which sit the courts of civil appeals.
It divides the State into counties, towns and cities, and calls them mu-

nicipal corporations. Const., art. 10. The Legislature would have no more power to disobey article 11 of the Constitution with reference to the creation of municipal corporations than it would to refuse to make provision for carrying on the State government, or to pass any other law therein required.

And it may be necessary here to refer more particularly to some provisions of the Constitution showing the clear command and evident purpose that these municipal corporations shall exist without reference to the legislative will or power. Article 16, section 48, expressly provides that all laws not repugnant to the provisions of the Constitution shall remain in full force and effect until amended or repealed. It is well expressed by the Supreme Court in State v. McAlister, 88 Texas: "At the time that the Constitution was adopted the law of 1875, entitled 'An act regulating the incorporation of cities of 10,000 inhabitants,' etc., was in force; the fifth section of which provided for the election of aldermen of cities by the electors of each ward of the city. See Laws 1875, p. 113. After the adoption of the Constitution, the laws were revised by a commission and adopted by the Legislature in 1879, and the section referred to was copied literally into the Revised Statutes, being article 346. The commissoners for revision of the laws, in their report to the Legislature, said, in reference to title 17, Cities and Towns, 'the substance of the old law is retained,' etc., showing that by construction of the revisers and the Legislature, this law was not repealed by the Constitution. At the time the Constitution was adopted there were many cities and towns in the State organized under the law of 1875, and under special acts, in which the same provision, in substance, for electing aldermen was embraced. In fact, it was the well known and common method of city government. The effect that is claimed for the Constitution in this particular would have operated to annul all such provisions in the general law and in the special charters, thus changing the established plan of municipal government. The purpose to destroy a system of municipal government so common in the State will not be attributed to the convention that framed the Constitution, unless the language used is so certain as to compel such a construction by the courts." Stronger language than this could not well be employed. Now, if this language states the law, and we think it does, it was not intended by the convention framing the Constitution to change the system of municipal government or to declare it void, but it was sought to perpetuate that system, then how could it be possible that the Legislature could be omnipotent in setting aside the "well known and common method" of said municipal government in Texas so perpetuated by the Constitution. If the Constitution did not destroy but perpetuate the "well known method" of municipal government, how could the Legislature destroy it?

Then, following up this line of thought, we turn to article 11 of the Constitution and find that cities and towns are classed as municipal corporations and placed on the same plane with the counties, for they are

mentioned in the same article; and all cities, towns and counties are denominated municipal corporations. By the language of this article, there are two classes of municipal corporations mentioned, cities and towns: First, the Legislature is to pass a general law or laws providing for the incorporation of cities and towns of 10,000 inhabitants or less. The next section of this article authorizes the Legislature to grant special charters to cities in excess of 10,000 inhabitants. And in these sections there are certain stipulations in regard to taxation; the amount of taxes to be levied and collected. These provisions are found in sections 4 and 5 of said article. Section 6 provides, "Counties, cities and towns are authorized, in such mode as may now or may hereafter be provided by law, to levy, assess and collect the taxes necessary to pay the interest and provide a sinking fund to satisfy any indebtedness heretofore legally made and undertaken, and provides the manner, etc., how such taxes shall be levied, assessed and collected, as well as for current expenses. Sections 7 and 8 are special provisions with reference to counties and cities bordering on the coast of the Gulf of Mexico, which are peculiar to those cities. It is not necessary to discuss these provisions. These matters are only cited or referred to to show that there are commands and provisions in the Constitution with reference to those cities and towns, which the Legislature is compelled to obey, and excludes the idea of the omnipotence of the Legislature with reference to these cities and towns. Section 9 provides: "The property of cities and towns owned and held only for public purposes, such as public buildings and the sites therefor, fire engines and the furniture thereof, and all property used or intended for extinguishing fires, public grounds and all other property devoted exclusively to the use and benefit of the public, shall be exmpt from forced sale and from taxation," etc. Article 8 further prohibits the Legislature from levying taxes on the property of municipal corporations; and authorizes counties, cities and towns to levy an occupation tax not exceeding one-half of the tax levied by the State for the same period on professions and business. Article 10, section 7, provides, that "No law shall be passed by the Legislature granting the right to construct and operate a street railroad within any city, town or village, or upon any public highway, without first acquiring the consent of the local authorities having control of the street or highway proposed to be occupied by such street railroad." It would hardly be contended that the Legislature is authorized to set aside or disregard this section, or any of these sections, of the Constitution in framing charter laws. Article 3, section 56, provides, "The Legislature shall not, except as otherwise provided in this Constitution, pass any local or special law authorizing the creation, extension or impairing of liens; regulating the affairs of counties, cities, towns, wards or school districts; * * * creating offices, or prescribing the powers and duties of officers in counties, cities, towns, election and school districts; * * * regulating the fees, or extending the powers and duties of aldermen,

justices of the peace, magistrates or constables." "Aldermen," here mentioned, have never been other than municipal officers.

In the legislative department of the Constitution we find an inhibition against the Legislature by special law extending power and duties of aldermen or regulating their fees. This must be done by general law, as except where "otherwise provided" in the Constitution. And it is nowhere provided otherwise in the Constitution, unless it be with reference to cities of over 10,000 inhabitants, so far as aldermen are concerned. But this is cited more especially to show that the Constitution expressly recognizes aldermen as officers of the city government. As said in State v. McAlister, "This was a common method of city government," and it was intended by the Constitution to perpetuate these matters in regard to city governments. Article 8, Constitution, confers taxing powers on cities and towns, and other provisions confer right of eminent domain as specified therein." The Legislature is bound by these constitutional provisions, and that body can not be omnipotent while these remain.

Section 52 of the same article provides that: "The Legislature shall have *no power* to authorize any county, *city, town* or other political corporation or subdivision of the State to lend its credit or to grant public money or thing of value, in aid of or to any individual, association or corporation, whatsoever; or to become a stockholder in such corporation, association or company." Now, in the face of the provisions of this section, would it be contended that the Legislature is omnipotent, to absolutely dominate, and that a "municipal corporation has no power not granted by the charter?"

Article 6, section 3, provides: "All qualified electors of the State, as herein described, who shall have resided for six months immediately preceding an election within the limits of any city or corporate town, shall have the right to vote for mayor and all other elective officers; but in all elections to determine expenditure of money or assumption of debt, only those shall be qualified to vote who pay taxes on property in said city or incorporated town; provided, that no poll tax for the payment of debts thus incurred shall be levied upon the persons debarred from voting in relation thereto." But this section is disposed of in Brown v. Galveston, supra, by the simple statement that this only applies in the election of mayor when there is a mayor to be elected. Of course, if there is no election there can be no voting. But that does not meet the question. We have, as shown in McAlister's case, supra, and by the provisions of the Constitution cited, not only the existence of municipal corporations as divisions of the State, but we have here the express recognition of mayors and elective officers, for that "was the common method of city government," and had been since 1837. If the Supreme Court is right that the convention which framed the Constitution *did not intend to repeal or set aside this well recognized form of city government,* then, *how can the Legislature set aside the*

*Constitution?* What are the provisions of this section of the Constitution? First, it relates to qualified electors; second, those who reside in the limits of any incorporated city or town; third, that their residence must be for six months immediately preceding the election; and fourth, it recognizes and applies only to cities and towns. Election of what? "Mayor and other elective officers." This recognizes mayors and other elective officers as officers of these cities and towns. Then, it is plain that this section was inserted for the purpose not only of prescribing qualifications of electors in municipal elections, but this directly where "mayors and all other elective officers" were or are to be elected. It was inserted for this purpose. There was no other reason for inserting it, for qualifications of voters generally had already been prescribed in article 6. If this is not an express recognition that municipal corporations existed with elective officers, and were well known divisions of the State, we are at a loss to understand what it does mean, and why it was inserted in the Constitution. If it does not expressly recognize the fact that the "mayor and all other elective officers" in municipal corporations are the officers of these corporations and elective, the insertion of it in the Constitution was worse than idle. If the Legislature can prescribe other manner of securing the officers of these divisions of the State and provide other agencies for the control of local self-government, under this clause of the Constitution, then that body has the power to set at naught said provision and section of the Constitution and utterly disregard it. If by passing an act, either special or general, with reference to these corporations, the Legislature can provide that the officers of municipal corporations can be appointed by the Governor or the Legislature, then there would be no question that this section of the Constitution would not only be set at naught by the Legislature, but by force of this setting at naught could thereby abrogate it and substitute legislative will in its stead. If they could do that then they could set aside the subsequent clause in the same section with reference to elections, in regard to the assumption and payment of debts, and provide other and different means by which these debts could be assumed than by the electors as provided by the Constitution.

Why was section 3 of article 6 inserted in the Constitution by its framers? Mayors and other elective officers were as well understood and recognized as officers of cities and towns as that the Governor and members of the Legislature were officers of the executive and legislative departments of the government. Its insertion is not idle or meaningless, nor to be set aside by any power, legislative, executive or judicial, or accidental. It was a recognition of the "common method of city government;" it perpetuates that "method of city government," it was intended that municipal officers should be elected in the same old way and the city government should exist on the same old plan,

and it was the purpose of the framers of that provision to preserve the old landmarks of local self-government and representative democracy. McAlister v. State, supra. This is the plain import of the language employed. By this and the other provisions cited, it was intended to erect a barrier against centralization in the State government.

If this were not true, then it would follow that the Legislature could abrogate local self-government, held fundamentally paramount everywhere with us, and which forms the basis of government, and substitute instead centralized municipal government at the capital of the State. If it be conceded the Legislature has the power to authorize the Governor to appoint the mayor and board of aldermen, or abolish the board of aldermen and create in lieu thereof a commission to be appointed by the Governor, then a fatal blow is struck at the Constitution and at our form of republican government; and this by construction and not by, but adverse to the provisions of, the organic law. If this can be done as to one town, it would necessarily follow that it could be so done as to every town in the State; and it would take no reasoning to show that the central authority at Austin could exercise absolute domination of every municipal corporation in the State. This point having been reached, it would then be no stretch of power to place all municipal corporations under one commission; and every municipal corporation in this State could be made to pass under the hands of a central commission, and the people of these different municipalities deprived of the right to govern their own matters in their own way.

A little incisive application of this rule directly to one section of the Constitution might show, that the "rule of omnipotent power" in the Legislature has been stretched too far, when it comes to the question of setting aside the ideas of local self-government and asserting power in the Legislature to destroy this right of local self-government in municipal corporations as understood and recognized from the beginning of American constitutional law. Section 1 of the Bill of Rights guarantees the preservation of the right of local self-government unimpaired in all the States. Section 2 provides, "All political power is inherent in the people, and all free governments are founded on their authority and instituted for their benefit. The faith of the people of Texas stands pledged to the preservation of a republican form of government, and, subject to this limitation only, they have at all times the inalienable right to alter, reform or abolish their government in such manner as they may think expedient." Now insert the rule of omnipotence in this clause, and read it as contemplated by that rule of construction, and we have a rather incisive test. It would then read: "All political power is inherent in the Legislature, and all free governments are founded on their authority and instituted for their benefit, unless expressly or by necessary implication reserved to the people. The faith of the Legislature of Texas stands pledged to the preservation of a republican form of government; and, subject to this limita-

tion only, the Legislature has at all times the inalienable right to alter, reform or abolish their government in such manner as they may think expedient." Would · any lawyer, or would any man, who understands the principles and theories of American constitutional government, contend for a moment that the people of this State ever intended that said section 2 of the Bill of Rights should read as it would read with this rule of construction inserted? This would make the agent superior to the principal; it would transfer to the Legislature the right to change the form of government, provided it left a republican form of government, and take away from the people what they claim to be their inherent political power. But *even then* it would prevent the Legislature from changing the government from a *republican form* of government to one of *centralized authority,* as this rule of omnipotence would do by destroying the right of local self-government.

It has always been understood that ours is a *government of complete decentralization.* "The American system," says Mr. Cooley, "is one of *complete decentralization,* the primary and vital idea of which is that local affairs shall be managed by local authorities; and general affairs only by the central authority. It was under the control of this idea that the National Constitution was framed under which the States, yielding to the national government complete and exclusive jurisdiction over external affairs, conferred upon it such powers only, in regard to matters of internal regulation, as seemed to be essential to national union, strength and harmony, and without which the purpose in organizing the national authority might have been defeated. It is this, also, that impels the several States, as if by common arrangement, to subdivide their territory into counties, towns, road and school districts, and to confer powers of local legislation upon the people of each subdivision, and also to incorporate cities, boroughs and villages wherever the circumstances and need of a dense population seem to require other regulations than those which are needed for the rural districts. The system is one which almost seems a part of the very nature of the race to which we belong. A similar subdivision of the realm for the purposes of municipal government has existed in England from the earliest ages; and in America, the first settlers, as if instinctively, adopted it in their frame of government, and no other has ever supplanted it, or even found advocates." Cooley Const. Lim., pp. 225-227. This doctrine found express recognition at the hands of this court in Ex parte Hazel Hart, 41 Texas Crim. Rep., at page ˙587, where the above language of· Cooley is quoted approvingly. Discussing this, Mr. Cooley says: "On a preceding page we have spoken in strong terms of the complete control which is possessed by the legislative authority of the State over the municipal corporations. There are nevertheless some limits to its power in this regard, as there are in various other directions limits to the legislative power of the State. Some of these are expressly de-

fined; others spring from the usages, customs, and maxims of our people; they are a part of its history; a part of the system of local self-government in view of the continuance and perpetuity of which all our constitutions are framed, and of the right to which the people can never be deprived except through express renunciation on their part. One undoubted right of the people is to choose, directly or indirectly, under the forms and restrictions prescribed by the Legislature for reasons of general State policy, the officers of local administration, and the board that is to make the local laws. This is a right which of late has sometimes been encroached upon under various plausible pretenses, but almost always with the result which reasonable men should have anticipated from the experiment of a body at a distance attempting to govern a local community of whose affairs or needs they could know but little, except as they should derive information from sources likely to have interested reasons for misleading." Cooley Const. Lim., 5 ed., p. 282. Whatever Mr. Cooley may have said with reference to the power of the Legislature, there is no question about the emphatic language he employs when asserting the right of local self-government by the people for themselves in their local affairs. Our government is one *essentially republican in form;* in other words, *it is a representative democracy.* The constitutional convention can not be formed except by delegates elected by the people. The Legislature can not be composed of representatives otherwise than those selected by the people. The Governor is the elected agent of the people. Under our system the judiciary is elective, and there is no way known among our people by which they select their officers otherwise than at the ballot box. It is the mode prescribed by which our people elect or select their officers, or rulers or public servants; and to keep from and avoid the centralization of power. This form of government is not only based on the theory of representative democracy, but also upon another as cogent a principle, that of the *complete decentralization of power.* It is so in the Federal Union; it is so in the State government. The Federal government is the agency of the States; clothed with certain authority for certain purposes; the president is chosen by the people through presidential electors; the senators represent the sovereignty of the State in the Federal Congress and are selected indirectly through the people by means of the Legislature; each congressman is elected to represent the people of his particular district. The President is a check upon Congress; Congress upon the President; and the Federal judiciary upon both. The senate is a check upon the house, and the house upon the senate. So in all departments of the Federal government we find the idea of *decentralization.* The government is constructed upon the theory that centralization of power in the hands of one man, or set of men, would be destructive of our form of government and dangerous to civil liberty.

Coming down to our State we find, as before stated, that our public

servants are elected by the people. The executive is a check upon the Legislature; the Legislature upon the Governor; and the courts upon both. We discover that our State, by the express terms of the Constitution, is divided into congressional districts, into judicial districts, into senatorial districts; representative districts; counties, cities and towns, commissioners' and justices' precincts and school districts; and provision made for other subdivisions. The State government as an entirety has general supervision under the provisions of the Constitution over the divisions and subdivisions. These divisions and subdivisions from the beginning have elected their own officers; the county its officers, the municipal corporations their mayor and aldermen and other officers. Wherever the appointive system is applied in municipal corporations that power has been vested in the city council, who are elected by the people. Until the charter granted the city of Galveston in 1901, this rule had an unbroken continuity so far as the writer is informed. Now it is proposed by the *"omnipotence of the Legislature"* to divest the people of the right to select their local officers, and confer power of appointing them on the executive. It would take no reasoning to comprehend that by this means our representative form of government could be easily destroyed; that the majority in the local subdivisions of government could be controlled by the appointment of officers from a minority, and the wishes and policies to be carried out by the people in their local affairs would be dominated by and from a central authority, instead of by the majority of the voters in the municipal corporation, and the will of the executive substituted for the will of the majority of the local voters. It is more than readily perceivable that the theory of *decentralization* and *representative form of government,* which has always dominated our State, would then become centralization. The ultimate effect of this can not be easily discerned. It is obvious if this condition should be carried out under this rule of omnipotence to its possible end, power such as never conceived by the people of this country at any time during the existence of the republican form of government, could be centralized in the dispensing power, and that the people of these subdivisions would hold their rights *not under the theory of representative government, but under the theory of centralized power* lodged in the hands of the executive by the Legislature. That this will not be fully permitted may be conceded, but the proposition is asserted by which it can be done, and the initial steps already taken. This is so clearly against the spirit, the theory, and the plain framework of our government that it ought not to be entertained for a moment. The basic principle of our government and "of our political system is that the ultimate sovereignty is in the people, from whom spring all legitimate authority." Section 2, article 1, Constitution; Declaration of Independence, July 4, 1776; Texas Declaration of Independence, March 2, 1836; Cooley's Const. Lim., 5 ed., p. 36; Spooner v. McConnell, 1 McLean, 347; 21 Wall., 162,

172; 2 Bland, 209; 20 Am. Dec., 360; 5 Cold., 221; Potter's Dwarris, chap. 1; 20 Wall., 663; Marbury v. Madison, 1 Cr. (U. S.), 118.

This is essentially true from the very nature of the framework. of the government as it now exists and as it has existed since the beginning, as well as the manner of putting it into operation. "A written constitution is in every instance a limitation upon the powers of government in the hands of its agents, for there never was a written republican constitution which delegated to functionaries all latent powers which lie dormant in every nation and are boundless in extent and incapable of definition." Cooley, 5 ed., p. 4, and notes; 15 Mo., 13; 21 N. Y., 9; 26 Ark., 625; 4 L. R. A., 69 to 79, 91; 24 Mich., 107. But a written constitution is something more than a limitation of power. It is first, a delegation and grant of power; second, a limitation of the exercise of the power granted.

Keeping in theory this idea of *decentralization* and *representative democracy* or *republican form of government,* we find in Stockton v. Montgomery, Dallam, 480, it was said: "That the Constitution is the basis on which the government rests and authority for all law; and is the commission under which the executive and the judiciary act. It is permanent and not influenced by the temper of the times. If the legislative act impinges its principles, the act must yield; and whenever it is brought before the court it must be declared void. Nay, the act is inherently nothing." 2 Dallas, 304; 1 Cranch, 175.

In Wilkinson v. Leland, "It was asserted to an attentive world that no government could be scarcely deemed free when the rights of the people were left solely upon the will of the legislative body without restraint." 2 Peters, 657; Dallam, 480. See also Calder v. Bull, 1 L. Ed., 648; Taylor v. Porter, 40 Am. Dec., 274; Cleveland v. Clement Bros., 59 L. R. A., 779; Holt v. Denny, 4 L. R. A, 71; Evansville v. Ind., 4 L. R. A., 91; Briggs v. McKeller, 2 App. Pr., 61; Pumpuly v. Oswego, 45 How. Pr., 247; Pratt v. Brackenridge, 65 S. W. Rep., 136; 4 Barb., 63; 57 N. Y., 477; 1 Ohio St., 511; 47 L. R. A., 52; 20 Wall., 642; 50 Am. Rep., 639.

A casual inspection of our Constitution makes it patent that everywhere the election of officers, that is, the elective system, is the paramount idea, i. e., they are elected by the people. Such is the method ordained by the inherent power of the people by which their governmental agents are chosen or selected. Apply this to the government of our cities and towns. Prior to the present Constitution these town officers were elected by the voters in the respective towns and cities. This has been so recognized by our Constitution. McAlister's case, supra. Even to the extent of changing their charters from one class to another class, as authorized by the statute. 71 Texas, 65; 72 Texas, 182; 76 Texas, 323, 566; 82 Texas, 583; 18 S. W. Rep., 144; 34 S. W. Rep., 673; 88 Texas, 14. See also the statutory law from the creation of the provisional government in 1835 until the present date,

except since the act chartering the city of Galveston in 1901. As to the recognition of these cities and towns as part of the State government, independent of the act of the Legislature, see article 3, secs. 50, 51, 52, 53, 54; art. 6, sec. 3; art, 7, sec. 3; art. 8, secs, 1, 5, 9, 10; art. 10, sec. 7; art. 11, secs. 3 to 10 inc.; art. 16, sec. 51. The latter section cited is a recognition of the difference between a homestead in the city or town and that in the country. These provisions of the Constitution must be omnipotent, and the Legislature must yield obedience. "The Constitution is either the superior paramount law unchangeable by ordinary means, or it is on a level with ordinary legislative acts, and like other acts is alterable when the Legislature is pleased to alter it. If the former part of the alternative be true, then a legislative act contrary to the Constitution is not law. If the latter part be true, the written constitutions are absurd attempts on the part of the people to limit the power in its own nature illimitable." Marbury v. Madison, 1 Curtis, U. S., 368. "Certainly all those who had framed written constitutions contemplated them as forming the fundamental and paramount law of the union, and consequently the theory of every such government must be that the act of the Legislature repugnant to the Constitution is void. Thus those who controvert the principle that the Constitution is to be considered in court as the paramount law are reduced to the necessity of maintaining that courts must close their eyes on the Constitution and see only the act of the Legislature. This doctrine would subvert the very foundation of all written constitutions." Ib. All courts may then well agree that where power is reserved in the Constitution legislative authority ends.

As before stated, we are met with the rule that the Legislature is omnipotent unless there is an express inhibition or an inhibition by necessary implication. This rule is too broadly stated from any standpoint, especially would this be so when diverted from its proper place and used to subvert the general framework of the government as laid out by the Constitution in its idea as before stated of complete decentralization. 7 Ind., 44; 34 Ind., 185; 7 Howard (Miss.), 24; 6 Am. and Eng. Enc. of Law, p. 921. Article 16, section 48, kept alive by express command the plan of municipal government, because that plan was not repugnant to but expressly provided by the Constitution in article 11, where the Legislature is commanded to prepare laws by which municipal corporations may be chartered and amended. So the moment the law as found upon the statute books in 1875 is repealed, the commands of article 11 forces the Legislature to pass general or special laws, as the case may be, with reference to chartering these municipal corporations. And article 11 is but another recognition of the command of the Legislature as found in article 16, section 48. So we say the rule when properly applied does not relate to nor authorize the Legislature to tear down the framework of our government. How was the Legislature to carry out this command of the Constitu-

tion? The answer is on the surface; that is, in the manner prescribed; and these laws must be consistent with and not repugnant to the Constitution, but must be in accord with the purpose, as expressed and intended by the language used; and the Legislature must enact such laws as will put in operation these provisions of the Constitution. This is a fundamental rule of construction. Any other rule is and must necessarily be repugnant to the Constitution. Limitation of power is on the agent, and not on the principal. The Constitution is not a measure of the rights and power of the people either reserved or inherent. Cooley's Const. Lim., p. 47, and notes. It delegates. It does not surrender authority to the agencies. It creates or commands creation of divisions and subdivisions of the State. This is imperative. As before stated, the rule of omnipotence is too broadly stated in Brown v. Galveston to apply to the questions in hand. This rule could not go farther than to authorize reasonable legislative enactment to carry out the provisions of the Constitution in administrative matters. It can not and will not be held to authorize the Legislature to destroy or change the framework of the government.

This unlimited power was more than a hundred years ago condemned by the Supreme Court of the United States as being pernicious. See Calder v. Bull, 1 L. Ed. U. S., 648; Wilkinson v. Leland, 2 Peters, 657; 9 Cranch, 43; 9 Gill & J. (Md.), 365; 30 Conn., 155; 4 Conn., 225; 10 Barb. (N. Y.), 244; 1 Bay (S. Car.), 252; 15 Maryland, 376; Black on Const., 177; 16 Pa. St., 256; 40 Am. Dec., 270; 59 L. R. A., 779; 4 L. R. A., 71, 99; 15 L. R. A., 369; 23 L. R. A., 747; 47 L. R. A., 52; 65 S. W. Rep., 136; 29 L. R. A., 78; 51 Ill., 17; 24 Mich., 44; 55 N. Y., 50; 34 L. R. A., 408; 90 N. Y., 75; 28 Mich., 228; 82 Ky., 15; 6 Am. and Eng. Enc. of Law, p. 1087, and note 3. In Calder v. Bull, supra, the Supreme Court said: "I can not subscribe to the doctrine of the omnipotency of the State Legislature, or that it is absolute and without control; although its authority should not be expressly restrained by the Constitution or the fundamental law of the State. The people of the United States erected their constitutions or forms of governments, to establish justice, to promote the general welfare, to secure the blessings of liberty, and to protect their persons and property from violence. The purposes for which men enter into society will determine the nature and terms of the social compact, and as they are the foundation of the legislative power, they will decide what are the proper objects of it. The nature and ends of legislative power will limit the exercise of it. This fundamental principle flows from the very nature of our free governments. There are acts which the Federal or State Legislature can not do without exceeding its authority. There are certain vital principles in our free republican governments which will determine and overrule an apparent and flagrant abuse of legislative power, as to authorize manifest injustice by positive law, or to take away that security for personal liberty or private property, for the protection of which the government was established. An

act of the Legislature (for I can not call it a law) contrary to the great first principles of the social compact, can not be considered a rightful exercise of legislative authority."

Draper v. People, 15 N. Y., is relied upon by our own Supreme Court and my brother Brooks in his dissent in Ex parte Lewis, supra. If it be conceded that it supports the rule of omnipotence, as claimed, then the reply is that Albertson v. People, 55 N. Y., 50, and Rathbone v. Wirth, 150 N. Y., 34 L. R. A., 408, overruled the Draper case. In Albertson's case, the Supreme Court of New York, speaking of the Draper case, said: "It is to be hoped in the interests of constitutional government by the people that the occasion to reaffirm these doctrines may never arise." Speaking of this matter that court further said of the Constitution: "Faithfully observed, and effect given to it in its spirit as well as in its letter, it effectually secures to each of the governmental divisions of the State the right of choosing or appointing its own local officers, without let or hindrance from the State government, and none can be deprived of the rights and franchises thus guaranteed to all. The theory of the Constitution is, that the several counties, cities, towns and villages are, of right, entitled to choose whom they will have to rule over them, and that this right can not be taken away from them and the electors and inhabitants disfranchised by any act of the Legislature, or of any or all the departments of the State government combined. This right of self-government lies at the foundation of our institutions, and can not be disturbed or interfered with, even in respect to the smallest of the divisions into which the State is divided for governmental purposes, without weakening the entire foundation; and hence it is a right not only to be carefully guarded by every department of the government, but every infraction or evasion of it to be promptly met and condemned; especially by the courts, when such acts become the subject of judicial investigation."

Again in Rathbone v. Wirth, supra, this language is found: "We must not forget that the Constittuion is the measure of the powers delegated by the people to their governmental agencies and not the rights of the people."

If the governor can appoint these officers, or if they can be selected by any appointive agency, that agency, be it the Governor or Legislature, becomes dictatorial and destruction of self-government follows; and every city and town will depend for its officers and governmental policies upon the centralized power.

Nor is the rule that the Legislature is as omnipotent as the constitutional convention a sound one. If so, the Legislature would have the power to amend the Constitution or supply any defects in it without referring it to the people for their approbation. It might be sufficient perhaps to cite article 17 of the Constitution, which provides the only method by which a defect in the Constitution can be cured, or by which amendment of any form can be made. If the Legislature has the same power as the constitutional convention, and placed upon the same plane,

then a constitutional convention would not be necessary, for the Legislature would have the same power to ordain the Constitution, and this without referring it to the people for ratification. This is not true, and from the very nature of our governmental system can not be true.

State v. Jameson (Ind.), 4 L. R. A., 79, as well as the preceding case of State v. Denny, had under consideration practically the question at issue in this case with reference to the appointment of police and fire and street commissioners. In the first case we find this language: "What, then, is the limit of the legislative power to appoint to office, created by statute, or is there any limit to such power? If there is no limit, then the general assembly of the State may create all the officers created by statute from the Attorney-General down to the smallest township officer, for they are all the creatures of the statute. It may appoint the board of county commissioners, the township trustees, county superintendents, and even road supervisors. It may create offices without limit and fill them with its own appointees. In the light of the contemporaneous history of the Constitution we do not think it will be seriously contended that the framers of that instrument intended to confer upon, or leave with the general assembly any such power. Where, then, is the limit? We think, whatever the limit may be, it is clear to us that it has no power to fill by appointment a local office like the one now under consideration. As the right to prescribe by law the manner of appointing to a new office created by the Legislature does not carry with it the right to make such appointment, we know of no provision in the Constitution under which such right can reasonably be asserted." It will be noted that the difference between the condition here stated and that in our State is that our Constitution expressly recognizes and requires the election of the "mayor and all other elective officers" in municipal corporations, specifically mentioning, as before seen, mayors and aldermen.

Speaking of this Mr. Dillon, in his work on Municipal Corporations, third edition, section 11, states the law, as follows: "To civil territorial divisions erected into corporations with defined powers of local administration, and the extension of the right to vote for officers to all who are to be affected by their action, are due that familiarity with public affairs and that love of liberty and regard for private rights and property which are characteristic of the best government in Europe— Great Britain—and the best in America—the United States. * * * We hold that the right to provide and maintain a fire department in a town or city is one of the rights which are vested in the people of municipalities and to be exercised by them, and is not subject to legislative interference, except in so far as they may prescribe rules to aid the people of the municipality in the exercise of such right; that such right is an element of local self-government which was vested in the people of the municipalities at the time of the adoption of the Constitution, and was not parted with by it; that so much of the statute

under consideration as relates to the management and control of the fire department of cities is unconstitutional and void." This would seem to be in direct line with McAlister's case, supra. "The conclusion we unhesitatingly reach is that the right of local self-government in towns and cities of this State is vested in the people of the respective municipalities, and that the general assembly has no right to appoint the officers to manage and administer municipal affairs; that the right of the general assembly ends with the enactment of laws prescribing the manner of selection and the duties of the officers." These are extracts from State v. Denny, from the cases found in 4 L. R. A., supra. State v. Barber, 93 Am. St. Rep., 225; Newport v. Horton, 50 L. R. A.; Owens v. Willis, 43 Texas, supra; City v. Thompson, 68 S. W. Rep., 477; Rathbone v. Wirth, 34 L. R. A., 408; O'Connor v. Fond du Lac, 53 L. R. A., 431; McDonald v. Louisville, 68 S. W. Rep., 413; Bolton v. Albertson, 55 N. Y., 50; People v. Detroit, 15 Atl. Rep., 202; People v. Hurlburt, 9 Am. Rep., 103; People v. Howland, 41 L. R. A., 838; State v. Moores, 41 L. R. A., 624; Simereal v. Searcy, 22 Neb., 454.

The system of local self-government which prevails in America has commanded admiration of such great writers as De Toqueville, Lieber and others; and it has been said that it is one of the greatest safeguards of civil liberty. Professor Lieber says self-government, general as well as local, is indispensable to our liberty. And Thomas Jefferson said: "These wards, called townships in New England, was the vital principle of their government, and have proved themselves the wisest invention ever devised by the wit of man for the perfect exercise of self-government, and for its preservation."

It would be an almost endless task to review the authorities of the different States bearing upon this question. If the authorities cited are sound, then it is placed beyond peradventure, mistake or doubt, that the right of local self-government is as much a part of the framework, machinery, theory, reason and spirit of our government as is the government iself as framed by the Constitution; and by sections 1 and 29 of article 1 of the Constitution is forever reserved from the general power of government.

But we are told in Brown v. Galveston, "There were no such municipalities within the territory constituting this State, and we have no such traditions or history connected with the municipal corporations to influence the court to determine the meaning of any of the provisions of the Constitution upon that subject." 75 S. W. Rep., 495. It had occurred to us, prior to this statement, that Texas had more varied municipal history than any State in the Federal Union. Though not incorporated as far back as 1537, according to Thrall's History, the present town of Ysleta, in the valley of the Rio Grande, in El Paso County, was known to be a flourishing village. This was nearly a century before the landing of the Pilgrim Fathers at Plymouth Rock. In 1540 this little town of Ysleta passed under the Spanish domination at the hands of Coronado. It is also stated by the same author, as a

historical fact, that in eastern Texas, on what is now known as the San Jacinto River, were towns and villages visited by La Salle about the year 1685 or 1686. These towns were built and inhabited by the Pueblo Indians. Coming down to a little later period, along about the year 1700, or soon thereafter, and more than a century before the declaration of Texas independence, began the organization of towns in the territory now within the boundaries of Texas. San Antonio may be regarded as the first on the list, which was for a long period of time the capital of Texas. Then came Laredo, Nacogdoches, Refugio, Goliad and others under the Spanish regime. And later on quite a number of towns under the Colonization Laws of 1825. It would be impossible to write anything like a correct history of Texas without San Antonio, and of San Antonio without the Alamo. We might as well expect a history of Greece without Thermopylæ as Texas without San Antonio; and San Antonio without the Alamo. What Lexington was to the American Revolution of 1776, Gonzales was to the Texas Revolution of 1836. A truthful history of Texas can not be written without Goliad, or of Goliad without the massacre of Fannin and his devoted little army. The history of the declaration of Texas independence could not be written without mentioning the little town of Washington on the Brazos, for it is here the declaration of independence was enunciated on March 2, 1836. At San Felipe de Austin met the convention which framed the provisional government, which occurred November, 1835. Nacogdoches is so interwoven with the early history of eastern Texas and with the great patriots of Texas who settled there that one can not well be written without the other. The little town of Texana, now said to be extinct, on the Navidad River, was the point at which occurred the first meeting of Texas patriots which threw upon the canvas a declaration of Texas independence. Over this meeting James Kerr presided, with Samuel Rogers as secretary. This little town was first known as Santa Anna, but later on its name was changed to Texana. This meeting occurred on July 10, 1835. On the 20th of the succeeding December, at the town of Goliad, a formal written declaration of Texas independence was signed by about ninety-one Americans, and promulgated on December 22, 1835. These were towns then well known to the inhabitants and history of Texas, then a Mexican state.

Omitting any history of the colonization laws of the empire of Mexico, we pass to the colonization laws of the Republic of Mexico and of Coahuila and Texas. These laws were promulgated in March, 1825. During that year the States of Coahuila and Texas ordained a Constitution, inserting therein a clause guaranteeing the right to elect all the officers of the different municipalities in the two States; and it may be that for the first time in the history of Texas the idea of local self-government became the leading feature of municipal government, and representative democracy the dominant feature in governmental authority. For these clauses of that Constitution, see volume 1 of Gam-

mel's Laws of Texas, pages 445, 446, and articles 155 to 167. Article 159 of that Constitution enumerated the officers; and article 164 provided the mode and manner of their election. So by the very express terms of the Constitution, towns were provided for and elective system for officials guaranteed. And it will be noted that the colonization laws carried forward this same idea. Paschal's Dig., art. 596, et seq. The colonization laws provided not only for the towns then existant, but as well for the laying out of new towns, and awarded to each a grant of four leagues of land, which were to be laid out in town sites for building purposes, and in lots for farming and grazing purposes— following the Spanish plan of laying out the town and adopting the American plan of electing officers and local self-government. The laying out these towns constituted the incorporation, and operated as their charter. So, for the first time perhaps in the history of this country or of America, we have the plan of the Spanish and American system of organizing and governing municipal corporations united and harmonized into one. The American brought and engrafted at once not only upon the colonization laws, but upon the Constitution of Texas and Coahuila, the American plan of representative democracy, the right of local self-government, and the right to elect their municipal officers. 1 Gammel's Laws, pp. 104, 105, 146, 147, 148, 149. With reference to the four leagues set apart to each of these towns and new towns, see same author, p. 131, sec. 34. And for further provisions, see secs. 35 to 48; Paschal's Dig., p. 217, art. 596, et seq. New towns were provided for by article 597, as shown by Paschal's Digest.

Following this, the Texans at the town of San Felipe ordained their provisional government. In article 6 thereof is found this language: "Each municipality shall continue to elect a sheriff, alcalde and other officers of the ayuntamientos." Paschal's Dig., p. 26; Sayles' Ann. Const., p. 143. The act of the Congress of Coahuila and Texas, May 19, 1827, decreed further as to how these elections should be held. 1 Gammel's Laws of Texas, p. 166, et seq. The history of our towns might be further followed up and at greater length for the facts which identify the history of municipal corporations with the history of Texas prior to the Texas declaration of independence in 1836, but a few will suffice.

In what is now known as Jasper County was created the towns of Teran and Bevilport; the latter town is now known as Jasper. Also the towns of Liberty, Anahuac, San Augustine, Viesca, later known as Nashville, situated in what is now Milam County, on the Brazos River; Columbus, Columbia, Brazoria, Matagorda, Gonzales, Bastrop and Victoria, and others.

Nor is the judicial history of our country deficient in furnishing conclusive evidence of municipal history in Texas long prior to the dawn of the Texas Republic. In Blair v. Odin, 3 Texas, 288, is some very interesting history of the town of Victoria, judicially ascertained by

the Supreme Court of our State, and shows to have existed prior to Texas independence. And that case is reinforced in regard to the history of Victoria in Kemper v. Victoria, 3 Texas, 135; and in another case between the same parties in the same volume, page 159. These cases judicially determine that Victoria was laid out in 1826, and ten years before the Republic of Texas. The town of Bastrop, originally called Mina, in honor of the noted revolutionist Gen. Xavier Mina, but which was changed by the act of the Texas Congress from Mina to Bastrop, in honor of Baron de Bastrop. Vol. 1, Gammel's Laws of Texas, p. 1432. For judicial ascertainment in regard to the town of Bastrop, and its being laid off prior to the Texas revolution, see Grimes v. Bastrop, 26 Texas, 316. The town of Refugio has some very interesting data judicially determined, showing its existence as a town long prior to the Texas revolution, in Refugio v. Byrne, 25 Texas, 199. Gonzales was laid off about 1831, and became a town in 1832. Some facts in regard to this town can be gathered from Bass v. Mitchell, 26 Texas, 372. Nacogdoches had a corporate existence while Texas was under the domination of Spain and Mexico, and before Texas declared her independence. State v. Dunson, 71 Texas, 65. In regard to the laws pertaining to this matter, the manner of laying off and organizing towns under laws prior to the Republic of Texas, see Sayles' Real Estate Laws, sec. 125, et seq. Practically all the towns mentioned, as well as others, had their charters recognized by acts of the Texas Congress in 1837 and 1838. Vol. 1, Gammel's Laws of Texas, pp. 1299, 1352, 1354, 1359, 1363, 1381, 1392, 1460, 1459.

Perhaps it is useless to pursue this matter further than to say that these different acts of the Congress of the Republic changed the names of the elective officers under Mexican dominition to such as are well known and recognized under the American system, to wit, mayors, aldermen, etc.

Before leaving this branch of the subject, we would call attention to the fact that the Supreme Court in an opinion rendreed by Judge Stayton, 69 Texas, 527, Jarvis v. Railway, judicially determined that the town of Laredo was laid off in 1767; and for some further data judicially determined by the Supreme Court of this State in regard to San Antonio, see Lewis v. San Antonio, 7 Texas.

All of these towns, without exception, were and are within the present boundaries of the State of Texas.

So we have whatever of municipal civilization may be gleaned from the Pueblo towns, found in Texas by the early Spanish discoverers; the organization and building up of towns under the Spanish domination, and those organized and erected under the Mexican authority; and those under the blended system of American and Mexican jurisdiction, occurring prior to the declaration of Texas independence, or the separation of Texas from Mexico, as well as that since 1836. The American people when they came into Texas brought with them their ideas of

local self-government as taught them in the older States of the Union, and engrafted them at once upon the Mexican and Spanish systems. Throughout it all, since 1825 to the present time, we have strictly adhered to the well known plan of American local self-government, so far as the elective system of municipal officers is concerned. The acts of the first Congress are replete with this history, wherein is emphasized the fact that the officers of these municipal corporations were elective and only elective.

There is another little significant fact we may state as an undeniable piece of history: that the existence of municipal government in Texas long preceded that of county organization and government. All towns we have mentioned had years of history before the system of dividing Texas into counties was recognized or practiced; and even under the Republic, the town of La Grange, now the county seat of Fayette County, was incorporated before there was a law passed authorizing the creation of the county of Fayette. Of course, the older towns necessarily existed prior to the formation of counties in Texas.

So far as we can ascertain, for the first time in the history of Texas since 1825 the Legislature undertook in 1901 to confer power upon the Governor to deprive the people of these municipalities of the right to vote for and select their officers, to destroy local self-government, and to confer all that power as of original source upon the executive. At this point it may not be improper to quote that immortal statesman, Edmund Burke: "This change from an immediate state of procuration and delegation to a course of acting as from original power is the way in which all the popular magistracies have been perverted from their purposes." We do not believe the Legislature of Texas has this power, and it was certainly never contemplated by the people in framing the Constitution.

Constitutions are historical documents, and each has a history of its own, and successive constitutions with their environments enter into the history of the country in which they apply (People v. Harding, 53 Mich., 485; Cooley Const. Lim., p. 75; Meunch v. Oppenheimer, 86 Texas, 568; Coombes' case, 38 Texas Crim. Rep., 648); and can be looked to when necessary in aid of construction. Endlich on Inter., secs. 517, 531; sec also Kendall v. United States, 12 Peters, 524; Prigg v. Commonwealth, 16 Peters, 539; Calder v. Bull, 3 Dallas, 386; Rhode Island v. Massachusetts, 12 Peter, 657; Stewart v. Laird, 1 Cranch, 299; Martin v. Hunter, 1 Wheat., 204; McCullough v. Maryland, 4 Wheat., 316; Pollock v. Steamboat Co., 24 U. S., 411; Baldwin's Const. Views, p. 8; Cohen v. Virginia, 6 Wheat., 264; Cooley v. Phil. Port Warden, 12 How., 299; Burrow v. Sarony, 111 U. S., 53; Ex parte Ginnochio, 30 Texas Crim. App., 584; Frasher v. State, 3 Texas Crim. App., 263; Brown v. Maryland, 25 U. S., 12; Page v. Allen, 98 Am. Dec., 272; Commonwealth v. Clark, 7 Watt & S., 127; Evansville v. Indiana, 4 L. R. A., 99.

We therefore, in accordance with the views expressed in Ex parte Lewis, supra, hold that the Legislature is without power to authorize the executive to appoint municipal officers; that the act of the executive appointing the "board of commissioners" is illegal; that the act of said board of commissioners appointing Stewart chief of police is void; that he is not clothed with authority as a peace officer to hold applicant, and that applicant is entitled to his discharge, and it is accordingly so ordered. All discussion of the validity of the charter is pretermitted except as above stated. The effect of the sections of the charter in regard to the commissioners upon the charter in its entirety is not involved in this opinion, nor is that intended to be discussed.

*Relator discharged.*

HENDERSON, JUDGE.—I agree to a disposition of the case on the first proposition stated in the opinion—that is, the court mentioned in the charter is not the corporation court provided for by general statute, but is a mere city court without jurisdiction of State cases. As to the commission, I do not deem it necessary to express an opinion.

BROOKS, JUDGE.—I dissent, and may write my views.

[Motion for rehearing overruled without written opinion.—Reporter.]